A form of order in accordance with this opinion is to be submitted.

Charles W. HANSEN and AFSCO Inc., Plaintiffs,

v.

Claude SIEBRING, d/b/a Siebring Manufacturing Company, Defendant. Owen Siebring, Intervenor.

Civ. No. 1118.

United States District Court
N. D. Iowa, W. D.

July 30, 1964.

John D. Gould, Phillip H. Smith, Minneapolis, Minn., Wallace W. Huff, Sioux City, Iowa, for plaintiffs.

Robert R. Eidsmoe, Sioux City, Iowa, Lucas DeKoster, Hull, Iowa, Donald H. Zarley, Des Moines, Iowa, for defendant and intervenor.

---

HANSON, District Judge.

On February 12, 1959, a patent infringement suit was instituted by Charles W. Hansen of Minnesota against Claude Siebring d/b/a Siebring Manufacturing Company at George, Iowa. The action was brought under Title 28 U.S.C. § 1338(a). That action ended in a consent decree filed October 19, 1959, and a writ of permanent injunction filed October 30, 1959. A settlement agreement was filed as part of the consent decree.

On February 1, 1962, a motion for contempt was filed by Hansen against the original defendant. The defendant has resisted the motion for contempt. Subsequently, on his application, Owen Siebring was allowed to intervene as a defendant. The defendants amended their resistance and on March 12, 1963, filed an amended and substituted motion for relief from judgment. On March 12, 1963, the defendants filed an application for leave to file a counterclaim. The case came on for trial on March 14, 1963. The defendants never filed a counterclaim.

At the trial, the pleadings were amended to add Afsco, Inc., a Minnesota corporation having its principal place of business at Luverne, Minnesota, as a party plaintiff.

Plaintiff Charles W. Hansen also filed a separate action against the defendants for infringement.

Dispute has arisen, as it sometimes will, among the parties as to what this case is concerned with and also as to what was litigated at the trial. References to the briefs of the parties point out the dispute over what the issue in this case is. The plaintiffs in their main brief state:

"The primary issue before this Court in this action is whether the structures manufactured and sold by the defendants after the previous Injunction are equivalent to the structures manufactured and sold by defendants previous to the Injunction and enjoined thereby or whether the subsequent structures are so substantially different from the structures previous to the Injunction as to raise entirely new questions of infringement. If the Court finds that the structures manufactured and sold by defendants since the previous Injunction are substantially equivalent to or merely colorably different from the structures of defendants enjoined by the prior Injunction, then it is proper for the Court to determine the questions of the defendants' infringement and contempt in this action. However, if the Court finds that the structures manufactured by defendants subsequent to the Injunction are so entirely different from the enjoined structures manufactured by defendants as to raise entirely new questions of infringement, then the plaintiffs must proceed by supplemental complaint for infringement. This is the reason that the new case No. 1267 was originally filed at the same time that the plaintiffs' Motion for a Contempt citation was filed in this case No. 1118."

The defendants start their answering brief by stating that the plaintiffs' statement of the issue would be correct for the normal patent contempt action. The defendants then state, starting on the second page of their brief, that:

"Prior to the decree, which was dated October 19, 1959, defendants had manufactured two different types of auger type feeders. The first feeder provided tube sections wherein each discharge opening was 'lowered' with respect to the preceding opening to create a progressive lowering of the holes along a straight line from one end to the other of the resulting auger tube. Such a unit is shown in PX 7. This first model was substantially discontinued and replaced by a second design wherein the discharge openings in each tube section were disposed along a *horizontal* line rather than the *sloping* line of the first unit.

The record is not clear as to the precise date that the second device was introduced but it appears that it made its appearance at least prior to the issuance of the Hansen patent on January 6, 1959. However, the original models with the progressively lowered holes were not completely abandoned and limited numbers thereof were still in existence even at the time of the decree in 1959. Thus, it is extremely important to note that during the pendency of the original action and at the time of the consent decree, defendants had two distinct feeders; one type with horizontal holes and the original type with the progressively lowered holes.

"Plaintiffs have erroneously assumed that the decree embraced both designs but the language of the decree simply does not substantiate this conclusion. It is defendants position that the decree only enjoined the first model with the progressively lowered holes, and that the decree in paragraph 6 even contemplated continued manufacture of a non-infringing unit, which could pertain to the only other unit being made, namely, the auger sections with the horizontal holes."

The plaintiffs in their reply brief state:

"Since the Defendants had abandoned the manufacture and sale of their first model of Plaintiffs' Ex. 7 in approximately May of 1958, the holding of infringement in the previous Decree, without question, referred to the Defendants' manufacture and sale of their subsequent model shown in Plaintiffs' Ex. 8.

"The preponderance and weight of the evidence definitely establishes that the Defendants' manufacture and sale of their first model shown in Plaintiffs' Ex. 7 was halted in the spring of 1958.

"The Defendants' second structure shown in Plaintiffs' Ex. 8 and having the discharge openings horizontally disposed in each tube section was the Defendants' only and exclusive commercial bunk feeding structure being manufactured by the Defendants since the spring of 1958 and, therefore, approximately eighteen months prior to the date of the Consent Decree and Injunction."

In connection with this issue, the court makes the following findings of fact:

1. Charles W. Hansen filed the patent application on his bunk feeder on or about June 18, 1957, and the patent, Number 2,867,314, was issued on or about January 6, 1959.

2. Prior to the entry of the consent decree, October 19, 1959, the defendant, Claude Siebring d/b/a Siebring Manufacturing Company, manufactured two types of bunk feeders.

3. The first type of bunk feeder, shown as Plaintiffs' Exhibit 7 in the record, contained tube sections in which the holes in each section were progressively lowered with relation to each other and were not on the same plane with each other. The second type of bunk feeder, shown as Plaintiffs' Exhibit 8 in the record, contained tube sections in which the holes in each section were on the same plane with each other and in which the holes in one tube section were not progressively lower with relation to the other holes in the same tube section. However, in this machine, sections of holes were lowered to give the alleged effect of progressive lowering. For convenience, the two machines will be referred to as Exhibit 7 and Exhibit 8.

4. The defendants began the manufacture of Exhibit 8 in the spring of 1958. Prior to this time, the defendants manufactured Exhibit 7. At one time, defendants made both types but at the time of the Consent Decree, the defendants were making only Exhibit 8 types and were not then making Exhibit 7 types. However, at the time of the Consent Decree, the defendants did have on hand some of the Exhibit 7 tubes.

5. The precise date at which the defendants stopped making Exhibit 7 is somewhat unclear. The court finds that the defendants ceased making Exhibit 7 types approximately one year prior to the Consent Decree. The defendants had been manufacturing the Exhibit 8 type for approximately one year prior to the date of the Consent Decree.

In Butler v. Denton, 150 F.2d 687 (10th Cir.), the court said in construing a Consent Decree:

"The purpose and function of construing doubtful provisions in a judgment is to bring out and give effect to that which is already latently in the judgment."

In Artvale, Inc. v. Rugby Fabrics Corp., 303 F.2d 283 (2nd Cir.), the court said:

"The essence of this contention is that, in construing the operative language of the decree, the court overlooked the separate agreement and the nature of the patent claims, which, it is contended, show that the parties intended to prohibit more than a slavish point-by-point imitation of the diagrams included in the patent. We do not deny that these items may shed light on the nature of the decree."

In Hamilton v. Rogers, D.C., 99 F.Supp. 509, the court applied the contract rule of construction to the consent decree.

There are portions of the Settlement Agreement and Consent Decree which do shed light upon the intentions of the parties and the effect of the Consent Decree. The Settlement Agreement states in part:

" * * * That the Defendant, doing business as Siebring Manufacturing Company, has, since the issuance of said patent, manufactured and sold at his plant at George, Iowa, devices constituting an infringement of said Patent 2,-867,314. * * *

"It is further agreed between the parties that Defendant shall have the right to sell all previously manufactured units which he shall be required to repossess from distributors or dealers together with six assembled units which he now has on hand. * * * "

The evidence is quite strong that at least the only assembled units which the defendant had on hand were of the Exhibit 8 type. The Consent Decree in its entirety reads as follows:

"The parties hereto having amicably settled their differences, as set forth in Settlement Agreement, copy of which is attached hereto, it is hereby ordered, adjudged, and decreed:

"1. That this Court has jurisdiction of the subject matter of the Complaint by reason of the fact that this action arises under the patent laws of the United States, 28 USC, Section 1338(a).

"2. That this Court has jurisdiction over the Defendant herein.

"3. That the Plaintiff is the original and sole inventor of the subject matter of Patent 2,867,314; that said patent is owned by said Plaintiff; and that said patent is good and valid in law.

"4. That the Defendant has infringed upon Patent 2,867,314 in suit by manufacturing and/or selling subsequent to the issue date thereof bunk feeders coming within the scope of the claims of said patent.

"5. Subject only to the qualifications of paragraphs 6 and 7 hereof, a permanent injunction shall be issued forever restraining Defendant, his heirs, employees, associates, servants, privies and those in active consort and participation with him, from manufacturing and/or selling devices which constitute an infringement of Patent 2,867,314 in suit.

"6. That the injunction provided for in paragraph 5 above shall not restrain the Defendant or those in consort with him from manufacturing and/or selling devices which do

not come within the scope of the claims of Patent 2,867,314 in suit.

"7. That the injunction provided for by paragraph 5 above shall not restrain the Defendant from selling the six (6) assembled units presently in his possession and those now in the possession of his distributors or dealers, which may in the future, be returned to said Defendant by said distributors or dealers.

"8. That Plaintiff's claim for damages, as defined by the pleadings herein, is hereby dismissed with prejudice.

"9. That Defendant's counterclaim on the basis of the settlement set forth in paragraph 3(a) of said Settlement Agreement is hereby dismissed with prejudice.

"10. That Plaintiff and Defendant shall each pay their respective costs and attorneys fees and no costs or attorneys fees shall be awarded to either party."

The thrust of the defendant's argument is that the Consent Decree and Injunction meant nothing with respect to infringement. The Court cannot accept this.

The Court finds that the second type bunk feeder shown as plaintiffs' Exhibit 8 must be held to have been decreed an infringing device by the Consent Decree. The Court feels this is the only reasonable interpretation of the Consent Decree, Settlement Agreement and Injunction and that this was the intention of the parties to those instruments.

The question is are the Siebring bunk feeders sold by the defendants subsequent to the Consent Decree merely a colorable imitation of the enjoined bunk feeder.

The four types of bunk feeders sold by the defendants since the Consent Decree and Injunction are described by the plaintiffs in their brief as follows:

(1) The Siebring feeder in which the only change from the enjoined structure was the so-called "wonder auger" of varying diameter, the same being manufactured and sold by defendants after the previous Injunction and until approximately February of 1961.

(2) The Siebring structure in which the only change from the enjoined structure was the so-called "wonder auger" of varying pitch, the same being manufactured and sold by defendants from approximately February of 1961 until approximately April or May of 1962.

(3) The Siebring structure having a varying pitch auger and half flaps or doors hingedly connected to the tube sections and adapted to cover approximately the one-half upper portion of the holes, the same being manufactured and sold by defendants from approximately April or May of 1962 until the fall of 1962.

(4) The Siebring structure with full flaps for the holes hingedly connected to the tube and using a standard pitch auger, the same being manufactured and sold by defendants from the fall of 1962 at least until the time of the trial on March 14–21, 1963.

By way of background the structure of the Hansen patent comprises a frame in the nature of a plurality of spaced stands for supporting the feeder, a fixed hopper into which the feed is conveyed from the storage area, an elongated discharge or delivery tube mounted on the frame structure for rotation about its longitudinal axis. The delivery tube is made up of a plurality of tube sections normally ten feet in length and the first of which is connected to the hopper for feed communication with the inside of the hopper. The structure of the Hansen patent further includes an elongated auger disposed within the delivery tube and which extends into the hopper to move feed from the hopper into the tube. The delivery tube sections have longitu-

dinally spaced discharge openings for discharging the feed from the delivery tube out into the feed bunk. A tube rotation control lever is secured to the delivery tube for adjusting the entire delivery tube about its axis, and the discharge openings in the delivery tube are lowered with respect to the tube as one progresses from the hopper end thereof to the outer end thereof.

An important novel feature and advantage of the invention disclosed in the Hansen patent in suit is its ability to provide even distribution of feed material in the feed bunk trough without regard to the amount or quantity of feed being run through the feeder or without regard to the type of feed being fed to the livestock. This important advantage and feature of even feed distribution is provided by the Hansen patent in suit because of the combination of two structural features of the machine in the combination of elements defined above. These structural features are (1) the provision of means for rotating the entire feed delivery tube about its axis, and (2) a lowering of the discharge holes with respect to the elevation of the tube as one progresses from the hopper end toward the outer end of the feeder.

The Hansen patent in suit has additional novel features which provide important versatility and operational advantages for the user. For example, the entire delivery tube of the structure of the Hansen patent can be rotated about its axis by means of the tube rotation control lever so as to position the tube with the discharge holes thereof at the top of the tube to permit use of same as a conveyor. Also, the delivery tube may be rotated to position the discharge holes at the bottom of the delivery tube so as to prevent the entry of rain or snow into the tube when the feeder is not being used. Another feature resides in the provision of deflection boards mounted beneath the delivery tube so that opposed feed lots on opposite sides of the tube may be fed the same or different feed formulas or rations.

The rotation adjustment control lever of the structure of the Hansen patent is important because it provides an adjustment for the feeder whereby the relative elevation of all of the discharge holes may be varied to provide even distribution of feed for different types of feed having various flow characteristics. The rotation adjustment control lever may also be moved to position the delivery tube so that feed may be distributed to less than the entire length of the feeder, which is often done when the farmer is not using the feeder to its full capacity.

The only substantial difference between the Exhibit 8 type bunk feeder manufactured and sold by the defendants previous to the Consent Decree and Injunction and the Hansen machine was in the arrangement of the discharge holes in the delivery tube sections. In this second structure manufactured and sold previous to the injunction, and shown as Plaintiffs' Exhibit 8, the discharge openings were arranged to be generally horizontal or parallel to the axis of the tube in each tube section, but the tube sections were capable of adjustment downwardly at the joints during installation so that the lowest walls of the discharge openings could be disposed progressively lower from a high point adjacent to the hopper to a low point at the outer end of the tube. This was the Exhibit 8 type bunk feeder which the defendants had been making and selling for one year to eighteen months prior to the Consent Decree and Injunction.

Since the date of the Consent Decree and Injunction, the defendants made and sold bunk feeders in which the variation from the Exhibit 8 type machine was in the auger. The defendants called this new auger a "wonder auger." There were two types of "wonder augers" used by the defendants although, of course, one bunk feeder has only one auger. In some of defendants' structures subsequent to the Injunction, the "wonder auger" was of the so-called tapered diameter type in which the individual auger sections were of constant diameter but the same increased in diameter from

the hopper end toward the outer end of the delivery tube. The second type of "wonder auger" was the so-called tapered pitch "wonder auger", and differed from the first "wonder auger" only in that the auger sections were of constant diameter but the sections increased in pitch from the hopper and toward the outer end, or in other words, the distance between the adjacent auger convolutions became less in each auger section as one progressed from the hopper end to the outer end of the tube. After six months to one year, the defendants abandoned their structure having the tapered diameter auger and began the manufacture and sale of bunk feeders using the so-called tapering pitch "wonder auger."

One type of standard auger used by the defendants prior to the Consent Decree was constructed with a 7 inch diameter and a 7 inch pitch. Where the varying diameter auger was used the diameter did not always change within each 10 foot section, but throughout the entire length, consisting of several sections, the diameter of the auger did change. Also with the varying pitch auger the pitch did not change from each convolution to the next but changed from one section of convolutions to the next. The defendants testified the "wonder augers" were the same in purpose and function and that they were not made by the defendants but were purchased on the market.

Another difference between the Exhibit 8 type bunk feeder and the bunk feeders sold by the defendants after the Consent Decree and Injunction was a progressive elongation of the discharge openings from one end of a tube to the other. This change in tube openings was sometimes combined with a "wonder auger" in the defendants' bunk feeders sold after the Injunction and Consent Decree.

The issue in the contempt proceedings is whether the defendants' machines sold after the Injunction and Consent Decree contained merely colorable changes from the Exhibit 8 type machine which was the subject of the Consent Decree and Injunction. The parties do not disagree that this is the issue in a contempt case.

What colorable change means has been defined in a number of cases. In American Foundry & Mfg. Co. v. Josam Mfg. Co., 79 F.2d 116 (8th Cir.), the court talked about fair grounds for doubt and whether there was an essential change in the nature of the device. In Hopp Press, Inc. v. Joseph Freeman & Co., 323 F.2d 636 (2nd Cir.), the court talked about whether the device performed substantially the same function in substantially the same way to accomplish the same result. See also Hartford-Empire Co. v. Obear-Nester Glass Co., 8 Cir., 95 F.2d 414; California Paving Co. v. Molitor, 113 U.S. 609; Kiwi Coders Corporation v. Acro Tool & Die Works, 7 Cir., 250 F.2d 562.

The defendants contend "that even if the injunction had pertained to defendants' original tube with horizontal holes (Exhibit 8 machine), the present models with horizontal holes are not 'colorable imitations' of the original units within the meaning of the law." The defendants allege to have made five variations from their Exhibit 8 machine since the Injunction:

(1) progressive elongation of the discharge openings from one end of a tube section to the other;

(2) use of a variable pitch auger instead of a standard auger;

(3) use of a tapered auger instead of a standard auger;

(4) use of adjustable "half flaps" above the discharge openings to adjust the flow of feed therefrom; and

(5) use of adjustable "full flaps" above the discharge openings to adjust the flow of feed therefrom.

The defendants further state in their brief that "the above features were adopted since the injunction to provide more desirable flow characteristics, and they do serve to create a more uniform

flow of material from the discharge openings."

There is no question but that the purpose of all of the defendants' machines as well as the Hansen machine is the same. That purpose is to attain uniform piles of feed in the bunks fed by the bunk feeder. The defendants advertised that their bunk feeder would do this and at the trial attempted to prove that their machine would give uniform piles adequate for feeding cattle. To state the purpose another way, the machine is to mechanically feed a number of animals at the same time and it is incumbent that there be general uniformity in the amount of feed going into each bunk. It is this purpose that all of the bunk feeders are intended to satisfy.

All the machines performed the same general function although some did not function as well as others and the various adjustments built into the machines had a direct relationship on how well the machine functioned. A large number of tests were made by the parties which developed the function of the machines and the relationship of the various possible adjustments to the function. The tests showed that the "wonder augers" would not provide anywhere close to uniform piles of feed in the bunks unless the various sections of holes in the tube were lowered with relation to the other sections of holes. The tests also show that for silage the lowering need not be as accentuated as for shelled corn.

The defendant Owen Siebring conceded that their machines made after the Consent Decree and Injunction would not give uniform feeding without lowering the holes, but he did contend that the machines gave satisfactory feeding. The defendants advertised before and after the Decree that their bunk feeders would give uniform piles of feed. The defendants did not contend that there was a difference in function or purpose in the two types of "wonder augers". The defendants did concede also that they first put the flaps on some of the holes because too much feed was coming out of some of the holes.

On March 6, 1963, the court entered a Discovery Order wherein it was ordered that the defendants furnish plaintiffs with the names of three representative purchasers of defendants' bunk feeders. On investigation by the plaintiffs, it was found that the bunk feeder of each of these purchasers had the sections of holes adjusted so that the holes were progressively lower from the hopper end of the tube to the other end of the tube. The defendants admitted that it is possible that the purchasers adjusted the holes so that they would be lower one to the other from the hopper end to the other end of the tube. The defendants stated that they imagined they would be adjusted at the farm for best uniform feeding.

The court finds that the defendants' machines with the "wonder augers" with or without the elongated openings were designed to perform the same purpose as plaintiffs' Exhibit 8 machine and the Hansen machine. The court finds that the function of the "wonder auger" insofar as it furthered the purpose of the bunk feeder was not substantially different from the standard auger. The court finds that the "wonder auger" did function slightly different than the standard auger in that it pushed more feed out the far end of the tube, but this function was not related to the purpose of the bunk feeder. The court finds that the principle upon which the defendants' machine with the "wonder auger" functioned was substantially or almost identical to the principle upon which the Exhibit 8 type machine functioned. The principle upon which both types of machines worked was to push feed by means of an auger through a tube with progressively lowered holes in order to get substantially uniform piles of feed in each bunk.

If the defendants had been able to make a machine with a "wonder auger" and holes all in one line which performed a desirable operation, it might be said that their machine functioned differently and on a different principle than the Exhibit 8 machine and the Hansen machine. The fact is, however, that the Siebring

bunk feeder with the "wonder auger" and elongated openings did not function on that basis and when adjusted in that manner desirable results were not reached. Obviously, because it did not give desirable results when adjusted that way it was not used that way but was adjusted so that the holes in the tubes were progressively lowered when it was used. For this reason the machines with the "wonder augers" with or without the elongated openings were not more than merely colorably different from the bunk feeder shown as Exhibit 8.

The defendants' "wonder auger" machine was sometimes sold with flaps on the first section of holes and these flaps were of a type called half flaps. They were called half flaps because they covered only a portion of the hole in the tube and were not constructed to entirely cover the hole.

The defendants developed another machine which had the following significant additions: a tube with each section bolted together to prevent the sections from being adjusted downward, a standard type auger of the type used in the Exhibit 8 type machine, and full flaps on each of the holes in the tube. The full flaps differ from the half flaps in that the flaps can be adjusted so as to cover the entire hole in the tube to which the flaps are attached.

Clearly the half flap has a limited function since the feed comes out the bottom of the hole. The defendants admit that it will not work for grain. This constitutes only a colorable and meaningless variation from the Exhibit 8 structure enjoined by the previous Consent Decree and Injunction. It would be necessary for this structure to be adjusted to a position in which the holes would be lowered from the hopper end of of the tube to the other end in order that it would achieve its purpose.

The court feels that the machine with full flaps, a standard auger, and tube sections bolted together was an experimental model put together for the purpose of trial. Obviously, it had not been sold because when the court ordered

names of representative customers given to the plaintiffs, the name of one of the purchasers of this type of machine would have been given. This is true even though there was some testimony that the machine may have been started six months prior to trial. Because this disclosure was not made or could not be made, the plaintiffs had no chance to test this machine to determine whether or not it actually would give a desirable result without adjusting the holes so that they would be progressively lower from the hopper end to the other end.

The defendants contend that they have changed their structure since the Decree and Injunction and these changes must be regarded as being more than marginal when considered in the light of the crowded art in which both plaintiffs and defendants are existing. More specifically on this issue the defendants contend that "the differences between defendants' original and current models are just as great and just as significant as the differences which exist between the above issue patents." The defendants were referring to the patents in defendants' exhibits X, Y, Z, A–1, A–2, A–3, A–4, A–5, and A–6.

The court has given careful consideration to this. There is no question but that the prior art may limit the scope of a valid patent. In American Foundry & Mfg. Co. v. Josam Mfg. Co., supra, the court said:

> "While the foregoing is sufficient to dispose of this issue, it may be added, as makeweight, that this patent is in nowise a pioneer, but (as said by the trial court in the infringement case) is a 'combination of features and parts, old in the art, and in germane and kindred arts' with a 'novel positioning of such parts so as to produce a new, useful result, or an old result in a more facile, mechanical and effective way.' In this connection—as possibly limiting the scope of the patent and, therefore, the construction of its claims—there are various citations in the record which would merit careful consider-

ation, if determination of such construction were before us."

In Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, the court while discussing the doctrine of equivalents stated:

"The doctrine operates not only in favor of the patentee of a pioneer or primary invention, but also for the patentee of a secondary invention consisting of a combination of old ingredients which produce new and useful results, Imhaeuser v. Buerk, 101 U.S. 647, 655, 25 L.Ed. 945, although the area of equivalence may vary under the circumstances."

The question of the validity of the Hansen patent and the question of the validity of the difference between the other patents cited by the defendants is not the question before the court. The court has considered the elongated holes, the "wonder augers", and the half flap and finds them to be mere colorable imitations of the enjoined bunk feeder. In making this determination, the court has considered the state of the prior art. The court has not concluded that the machine with the standard auger and full flaps is a colorable imitation of the infringed bunk feeder because it has not been tested to determine whether the full flaps perform a function upon a new principle in such a manner so as to raise a serious question of infringement.

As to the other alleged improvements, what the court said in Eureka Tool Co. of Kansas v. Wire Rope Appliance Co., 10 Cir., 265 F. 673, is most in point. The court said:

"If this had resulted in permanent stability of the core, the change would have been effective, since it would have eliminated both of the useful features in the patented device and in the infringing device; but testimony showed that such a rigid construction was not practically effective in actual operation, that the pins wore off and dropped out after only a few hours' use, and that they could be easily removed by drillers

before use, thus obtaining all the results of the infringing device by a precisely similar device. This was clearly only a colorable change.

"The attempt of the plaintiff in error is to justify its second device by a showing of the state of the prior art. The place which consideration of the prior art can have in this character of proceeding is to limit the scope of the patent in respect to mechanical equivalents. This is true, because this is not an infringement proceeding, but is one to enforce and make effective an existing judgment of infringement, by preventing violation of that order through merely colorable changes from the device already adjudged an infringement."

The defendants contend that their machines do not infringe if the sections are not adjusted downward and that at most they can only be implicated if they place in the hands of a farmer a device that can be easily and automatically converted to an infringing structure. The defendants in their brief say:

"Only pure conjecture of the highest order would conclude that (1) farmers will always undertake the adjustment of defendants' unit, and (2) the tubes will be carefully adjusted to an infringing position, when (A) the units will, as a practical matter operate satisfactorily without lowering of the holes, and (B) the lowering of the holes will not improve the uniform flow unless the farmer carefully balances the variable factors of (a) the proper lever control setting; (b) the degree to which each tube section is rotated with respect to another; (c) the speed of the auger motor; (d) the moisture percentage of the material being handled; and (e) the amount of feed being supplied to the hopper."

The answer to this argument is that the defendants admit that their machines with the "wonder augers", half flaps, and elongated openings will not work at least for certain types of

feed. The tests conducted show that these alleged improvements are ineffective to produce the results the bunk feeders are supposed to produce and which the defendants have advertised their machines will produce. All the bunk feeders examined on the farms, save one, were found to be adjusted so that the holes were lower from the hopper end to the other end. The machines are not sold assembled but are sold unassembled. The defendants knew the machines might be adjusted so that the holes would be lowered and the machines were constructed so that this could easily be accomplished. It does not need to be denied that there are a number of factors which influence the adjustments necessary to get uniform feeding. It is clear that the case comes squarely within the rule that one cannot make a machine readily capable of being adjusted so as to infringe and then escape infringement by adding alleged improvements which are in actual practice not effective in achieving the result the machine is expected to achieve. Eureka Tool Co. v. Wire Rope Appliance Co., supra. The machines are capable of being easily adjusted so that they will give uniform feeding for all types of feed. The plaintiffs contend that common sense dictates that the farmers will make the adjustment in the level of the holes rather than get less satisfactory results for some feeds and poor results on other feeds by leaving the holes all on the same plane. The inspection of the machines on the farms proves that the plaintiffs are correct in this contention.

### THE ISSUE OF INFRINGEMENT.

The defendants cite a number of cases to the effect that the court had discretion to determine whether the charge of infringement should be determined in the contempt proceedings or in a separate action. The defendants also cite portions of the record as support for their claim that this court actually did hear the infringement charge along with the charge of contempt.

The defendants claim that the key question of infringement is the meaning attributable to the term "progressively lower" as used in the Hansen patent. The defendants' claim is based on the concept that infringement of a patent claim is avoided by eliminating even one element of the claim.

The defendants concede that Professor Strait testified that the arrangement of holes in defendants' tubes responds to the "progressively lower" claim of the Hansen patent. Defendants claim that Professor Strait was incompetent to so testify. "The interpretation of the claims of a patent is not to be determined by the opinion of experts, but is a question of law for the court." Solomon v. Renstrom, 150 F.2d 805 (8th Cir.). Professor Strait, however, was a man skilled in the art to which the machines and patent in question pertain. His testimony as to the function, operation, and purpose of the machines and comparisons of the machines in these respects is entitled to weight.

The defendants claim the term "progressively lower" used in the Hansen patent should be considered in light of the patent specification. Defendants say that the plaintiffs' contention, that "progressively lower" does not mean that the openings starting adjacent to the hopper and running to the remote end have to be downward in a straight line, has no basis in the patent specification or the file wrapper contents of the patent. The defendants claim that the patent specifications show only discharge openings disposed on a continuous downward sloping line.

The defendants claim that because of the cancellation of original claim 1 the plaintiffs abandoned or surrendered their claim that the holes in the tube did not need to be continuously and progressively lower as for example in the Exhibit 8 type bunk feeder tube. Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132, and Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 582, 18 S.Ct. 707, 42 L.Ed. 1136, are cited for that proposition.

The defendants say the deletion of the word "continuously" from the original

language did not change the scope of the claims because the term "progressively" presupposes a continuous lowering of discharge openings and the word "continuously" was redundant.

The defendants admit that the question of validity was not at issue but do claim that the Hansen patent must be considered in the light of the prior art and the claims therefor narrowly construed.

The defendants contend that there is no evidence that any bunk feeder can achieve uniform discharge of feed and that the plaintiffs did not produce any tests of the Hansen machine.

The defendants contend that plaintiffs' expert admitted that if the holes are all horizontally disposed there would be no infringement. Of course, the plaintiffs have never contended that a machine actually used with holes all horizontally disposed would infringe. In connection with this, the defendants contend that the farmers cannot and will not be able to adjust the feeders so that they infringe, and further that they can achieve satisfactory feeding without adjustment and, therefore, will have no need to adjust the machine to lower the holes.

The plaintiffs contend that the court did not need to and did not in fact take up the issue of infringement in the contempt proceedings, but allege that even so, the evidence is sufficient for and requires a finding that the defendants' machines do infringe the Hansen patent.

 In response to defendants' claim that the Hansen patent is limited by the specifications, the plaintiffs say that they were only required to set forth in the specifications the best mode contemplated by the inventor for carrying out his invention. Plaintiffs say the claims are not limited to the form of the specific preferred embodiment disclosed. In G. H. Packwood Mfg. Co. v. St. Louis Janitor Supply Co., 8 Cir., 115 F.2d 958, 962, the court said:

"'An inventor must describe what he conceives to be the best mode, but he is not confined to that. If this were not so most patents would

be of little worth. * * * The invention, of course, must be described and the mode of putting it to practical use, but the claims measure the invention. They may be explained and illustrated by the description.' * * * 'In making his claim the inventor is at liberty to choose his own form of expression, and while the courts may construe the same in view of the specifications and the state of the art, they may not add to or detract from the claim.'"

This being the well defined rule, this court must interpret the claims without giving any conclusive effect to the specifications.

In response to defendants' argument based on the amendment to the original claim 1, the plaintiffs claim:

"As mentioned, application claim 1 had no restriction or limitation as to the disposition of the discharge openings and amendment of application claim 1 to include any limitation of hole disposition distinguishes the amended claim from application claim 1.

"If the Hansen patent would have issued with canceled application claim 1, the same would have covered any possible hole arrangement or disposition, so long as the holes were spaced lengthwise of the feeder. The Hansen patent is not intended to cover all possible hole positions or arrangements (the substance of canceled application claim 1); but rather, the Hansen patent is intended to cover all bunk feeder tube constructions having the hole dispositions or arrangements of the patented structure wherein the tubes are constructed to provide a general pattern of a lowering (not each hole, obviously) as one progresses from the hopper end toward the outer end of the tube. The Plaintiffs' patent is not intended to cover a tube having the holes positioned to provide a general pattern of a raising as one progresses to the outer end of the

tube, for example, nor is the Hansen patent intended to cover a hole arrangement wherein a plurality of holes are positioned in a pattern which extends around the tube several times in the nature of a spirally or helically wound pattern around the tube, for example."

The court feels the plaintiffs are correct in this connection. Original claim 1 was not restricted to any types of hole arrangement. It follows that the amended claim might not be able to cover both raising and lowering, or lowering and horizontal, but it in no way prevents Hansen from claiming several types of lowered hole arrangements. This is true especially since the word "continuously" was removed from the claim. The claim no longer contains both the words "progressively" and "continuously". The removal of the word "continuously" was not solely the removal of a redundant term. It certainly tended to broaden the claim to cover progressive lowering that is not continuous from one hole to the next. The doctrine of equivalents may not be used to give to an allowed claim a scope which it might have had without the amendments, the cancellation of which amounts to a disclaimer. Schriber-Schroth Co. v. Cleveland Trust Co., supra; Westinghouse v. Boyden Power Brake Co., supra. The plaintiffs are not claiming the scope which it would have had if not for the cancellation. The defendants' machine does not come within the area which was excluded by the cancelled claim. See Van Brode Milling Co. v. Cox Air Gauge System, Inc., 279 F.2d 313. Here there is no showing that plaintiffs surrendered anything in connection with how the holes should be lowered considering all the amendments and that the cancelled claim was very general. See Smith v. Mid-Continent Inv. Co., 106 F.2d 622; New York Scaffolding Co. v. Whitney, 224 F. 452; Hunt Tool Company v. Lawrence, 5 Cir., 242 F.2d 347; L. S. Donaldson Company v. La Maur, Inc., 299 F.2d 412 (8th Cir.).

The doctrine of equivalents applies only if the two devices do the same work in substantially the same way and accomplish substantially the same result. Parmelee Pharmaceutical Company v. Zink, 285 F.2d 465 (8th Cir.); Wheat v. Ford Motor Co., 118 F.2d 612 (8th Cir.). In Walker on Patents, Sections 467, 468, 469, the tests of identity of function, substantial identity of performance and identity of result are considered. Substantial identity is what is required. The following three machines of the defendants would easily be said to infringe on the basis of this doctrine:

(1) The Siebring feeder in which the only change from the enjoined structure was the so-called "wonder auger" of varying diameter, the same being manufactured and sold by defendants after the previous Injunction and until approximately February of 1961.

(2) The Siebring structure in which the only change from the enjoined structure was the so-called "wonder auger" of varying pitch, the same being manufactured and sold by defendants from approximately February of 1961 until approximately April or May of 1962.

(3) The Siebring structure having a varying pitch auger and half flaps or doors hingedly connected to the tube sections and adapted to cover approximately the one-half upper portion of the holes, the same being manufactured and sold by defendants from approximately April or May of 1962 until the fall of 1962.

The only difficult problem is whether any range of equivalents can be given the Hansen patent because of the surrendered claim, the prior art, and the specifications. While these considerations do restrict the doctrine of equivalents, the cases cited show that in circumstances such as this case, the doctrine of equivalents is completely inapplicable.

The court concludes that the issue of infringement was not actually taken up in the contempt proceedings.

Nonetheless, the evidence produced was exhaustive and is easily sufficient to show that not only were the three machines produced by the defendant and intervenor mere colorable imitations of their Exhibit 8 type machine produced prior to the Injunction but the evidence was also sufficient to show that these machines infringed the Hansen patent.

Therefore, the court will decree, only because the defendants are content that infringement was actually at issue, that the three machines not only were mere colorable imitations of their previously enjoined Exhibit 8 type machine, but that these three machines did infringe the Hansen patent. Accordingly, judgment will be entered.

A hearing as to the nature and extent of the damages will be set by further Order of the Court.

It is ordered that the foregoing shall constitute the findings of fact, conclusions of law, and order for judgment in this case. Rule 52(a) of the Federal Rules of Civil Procedure.