**SUNBEAM CORPORATION, Plaintiff,**

v.

**S. W. FARBER, INC., and Hoyt K. Foster, Defendants.**

United States District Court
S. D. New York.
March 19, 1965.

Gilbert, Segall & Young, New York City, George R. Clark, Walther E. Wyss, Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., for plaintiff.

Morgan, Finnegan, Durham & Pine, New York City, for defendants.

TENNEY, District Judge.

Defendants S. W. Farber, Inc., and Hoyt K. Foster move herein for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, contending that there is no dispute between the parties as to any material question of fact. In opposition, plaintiff points to facts which it contends are material to the within action and which are in dispute. Plaintiff's contentions have merit and the motion will accordingly be denied.

This is a civil action by plaintiff, the losing party, in an interference proceeding before the Patent Office brought pursuant to Section 146 of Title 35 of the United States Code (35 U.S.C. § 146 (1954)). The interference was declared on March 14, 1958 and was identified as Interference Proceeding No. 89,155.

The subject matter involved was described by the Examiner as follows:

"Briefly stated, the common invention at issue [is a] temperature regulating device for controlling an electrically heated appliance, such as a frypan, griddle, etc. The electri-

cally heated appliance is provided with electrical heating means including terminal portions. A body having an elongated cavity defining a temperature sensing zone is provided on the appliance between the aforesaid terminal portions. The detachable temperature regulating device includes a housing having terminals directly engageable with the terminal portions of the heating means and a temperature sensing member projecting from said housing. The sensing member is receivable in said cavity and is of such length that it will enter the temperature sensing zone defined by said cavity at least as soon as engagement is made between the engageable terminals on the appliance and regulator housing. The detachable temperature regulator may be readily removed when the appliance is to be cleaned after use, thereby protecting the sensitive temperature regulating parts from damage by water, grease, etc." (Wyss Affidavit, Exh. 12, at 2.)

On November 30, 1954, defendant Hoyt K. Foster filed an application for Letters Patent in the United States Patent Office for an invention entitled "Electric Cooking Utensil", which application was given Serial No. 471,949. This application was assigned by Foster to S. W. Farber, Inc., Foster also filed on Sept. 22, 1955, an application, Serial No. 535,797, which was assigned to defendant Farber as well.

On April 15, 1955, Ivar Jepson and James E. Hill, plaintiff's assignors, filed an application with the Patent Office for Letters Patent which was given Serial No. 501,652, relating generally "to an electric cooking vessel with built-in heating means and automatic temperature control therefor." (Wyss Affidavit, Exh. 1, at 1.) In addition, four other applications were submitted relating to similar subject matter:

   (a) Serial No. 645,846, Cassidy, filed March 13, 1957, and assigned to Pace, Inc., Mansfield, Ohio.

   (b) Serial No. 621,411, Sheahan, filed November 9, 1956, and assigned to The A. C. Gilbert Co., New Haven, Connecticut.

   (c) Serial No. 607,110, Bletz, filed August 30, 1956, and assigned to Stevens Manufacturing Co., Inc., Cleveland, Ohio.

   (d) Serial No. 518,511, Sorenson, filed June 28, 1955, and assigned to National Presto Industries, Inc., Eau Claire, Wisconsin.

On November 19, 1957, the Examiner in the United States Patent Office, in accordance with the provisions of Rule 203 of the Rules of Practice in the United State Patent Office in Patent Cases (hereinafter referred to as "Rules"), contacted the attorneys for the respective parties and suggested to each the identical claim for purpose of interference. This claim read as follows:

"An electrical heating device comprising means to be heated, electrical heating means therefor including electrical terminals, means on said device including an elongated cavity having an opening defining a temperature sensing zone, said cavity being positioned between said terminals, and electrical energy conducting and regulating means detachable from said device, said detachable means including terminals directly engageable with the first said terminals and a temperature sensing projecting member, *said member being of such length that it will enter said zone at least as soon as engagement is made between said engageable terminals.*" (Emphasis added.)

Pursuant to Rule 203(b), this claim was copied into the respective applications of the six aforementioned applicants.

Jepson and Hill added the claim as claim 38 of their application No. 501,652 on November 29, 1957. Foster added the claim to his application No. 535,797 as claim 21 on December 3, 1957, and on the

same date the claim was also added to Foster's application No. 471,949 as claim 22. The claim was similarly added to the applications of the remaining four parties.

On March 14, 1958, in accordance with Rules 207 and 209, the Examiner in charge of the six applications mailed an interference notice to the respective parties. This notice officially established Interference No. 89,155.

After notifying the parties concerning the filing of a preliminary statement (Rules 215 and 216), the Examiner contacted them, setting forth the details of all the applications by serial number and filing date (Rules 211 and 226). In addition, this notification set a motion period (Rule 231) to expire November 18, 1958, within which time the parties could bring various motions as provided in Rules 232–236, whereby the interference issues could, if necessary, be more accurately framed.

During said period, several motions were brought by various parties, including: (a) a motion by Foster under Rule 234 to substitute his earlier filed application No. 471,949 for the application No. 535,797 which was involved in the interference, and (b) motions by Foster and others under Rule 233 to add additional counts to Interference No. 89,155 or to set up additional interferences to more fully define the issues between the parties.

Among the motions brought by Foster was a motion under Rule 233 to amend the issue by proposing a number of counts reading as follows:

"A. An electrical heating device comprising means to be heated, electrical heating means therefor including electrical terminals, means on said device including a body having an elongated open-end cavity defining a temperature sensing zone, said body being positioned between said terminals, and electrical energy conducting and regulating means detachable from said device, said detachable means including terminals directly engageable with the first said terminals and a temperature sensing projecting member, *said member being of such length that it will enter said zone at least as soon as engagement is made between said engageable terminals*." (Emphasis added.)

"B. An electrical heating device comprising means to be heated, electrical heating means therefor including a pair of electric terminals, means in heat conducting relationship to said device including a body having an elongated open end cavity defining a temperature sensing zone, said body being disposed adjacent to said terminals, and electrical energy conducting and regulating unit detachable from said device, said energy conducting and regulating unit having a body part, terminals carried by said body part and directly engageable with the first said terminals, an elongated member extending from said body part and formed of heat conducting material and having a hollow portion of substantial length, a second member within and in engagement with the distal end of the hollow portion of the first said member, said second member extending from the other end of the first said member and into said body part, at least one of said member being responsive to temperature changes to change its dimension, switch means within said body part and mechanically coupled to at least one of said members for opening and closing the switch means in response to said changes, and means electrically interconnecting said switch means with at least one of the first said terminals to control the temperature of said device, *the hollow portion of the first said member being of such length that it will enter said zone at least as soon as engagement is made between said engageable terminals*." (Emphasis added.)

"C. In an electrically heated vessel having a heat conductive metallic wall, the combination of a metal en-

closed resistance heating element in heat transfer contact with said wall and having closely adjacent end portions and parallel terminal prongs by which power is supplied to said element, said terminal prongs extending clear of said vessel, a metallic body receiving heat from said heating element and provided with an elongated heat sensing cavity adjacent to said end portions and parallel with said terminal prongs, and an electrical energy supplying and regulating unit detachable from said vessel, said unit having terminals directly engageable with said terminal prongs, and a temperature sensing projecting member, *said member being of such length that it will enter said cavity at least as soon as engagement is made between said terminals.*" (Emphasis added.)

By a decision rendered on July 31, 1959, the Examiner permitted Foster to substitute application No. 471,949 for No. 535,797. Proposed Count A was added to the Jepson and Hill application No. 501,652 as claim 40, and to the Foster application No. 471,949 as claim 23, and subsequently became the single count in the interference. Proposed Count C was added to the Foster application No. 471,-949 as claim 24, and is quite similar to claim 14 of Foster's Patent No. 3,095,498. However, the Examiner declined to declare a new interference between Foster and some of the other parties with respect to proposed Count C. He held as follows:

"It is not seen where the proposed count contains any limitations patentably differentiating from the present count in interference. Although proposed Count C may be considered patentable over the art of record, *it is not patentably distinct from the present count in interference and is incapable of supporting a separate patent.*" (Wyss Affidavit, Exh. 12, at 11.) (Emphasis added.)

The party Sorenson also brought several motions to amend suggesting a proposed Count IV, which read as follows:

"IV. An electrical heating device comprising means to be heated, electrical heating means therefor including electrical input terminals, heat conductive means disposed to be heated by said heating means and including an elongated cavity having an opening adjacent said input terminals and defining a temperature sensing zone, a handle fixed on said device for manipulating it, and an electrical potential supplying and regulating unit detachable from said device, said detachable unit including further terminals engageable with said input terminals to supply electrical potential to said electrical heating means and dis-engageable from said input terminals to remove electrical potential from said electrical heating means, conductor means through which said further terminals are connectible to a source of electrical potential, and a temperature sensing projecting member, *said member being of such length that it will enter said zone at least as soon as engagement is made between said engageable terminals.*" (Emphasis added.)

The Examiner, with respect to this proposal, held as well that while the "proposed count may be considered to be patentable over the prior art it is not patentable [sic] distinct from the present count in interference and is not capable of supporting a separate patent." (Wyss Affidavit, Exh. 12, at 17.)

The party Sorenson requested reconsideration of the above-mentioned decision. In denying the request for reconsideration, the Examiner observed in language particularly relevant to the motion herein: "It is agreed with the party Jepson et al in their memorandum in opposition hereto, that any possible argument as to the patentability of proposed Count IV can only be with respect to the functional language at the end of the proposed count, and this identical language appears in the present count in interference. Therefore, a final decision with respect to the present count will be determinative." (Wyss Affidavit, Exh. 15, at 2.)

On April 8, 1960, Interference No. 89,-155 was redeclared as a two-party interference, the other applicants having been dropped from the interference. The two-party interference involved the Jepson & Hill application No. 501,652 filed April 15, 1955, and the Foster application No. 471,949 filed November 30, 1954. The original count was stricken and replaced by Count 2 which is proposed Count A set forth above. Testimony periods were set in accordance with Rule 251, and the interference proceeded to a determination.

After each side took testimony and introduced exhibits, all made part of the record pursuant to Rule 253, briefs were prepared and oral argument heard before the Board of Patent Interferences on July 10, 1962. On August 28, 1962, a decision was rendered by the Board of Patent Interferences from which the instant action was taken. The decision, after reviewing the testimony and adverting to the exhibits presented, awarded priority to defendant Foster, the senior party.

■ Plaintiff argues that priority was not only awarded as to the particular count in issue, but to all common patentable subject matter. There can be no doubt but that this is a proper statement of the law. Blackford v. Wilder, 28 App. D.C. 535, 1907 C.D. 14 (1907). See Vassil Affidavit of March 2, 1964, ¶ 4e; Memorandum of Law in support of motion at 6; Transcript of Oral Argument at 4).

The present action was instituted on December 28, 1962, seeking review of the August 28, 1962 decision of the Board.

The written record of the Patent Office shows that Foster's attorneys filed a nine-page amendment (Vassil Affidavit, Exh. A–3, at 57–65) officially dated January 23, 1963, followed by an eleven-page supplemental amendment officially dated April 17, 1963 (id. at 66–76).

In the "remarks" following the amendment submitted on January 23, 1963, defendants' attorney asserts that the claims as presented were reviewed by an Examiner on January 17, 1963, and that "it was understood that they were allowable over references thus far cited during the prosecution as well as additional references listed below." (Id. at 63–64.) One of the references so listed was British Patent No. 603,191. In the "remarks" following the amendments submitted on April 17, 1963, defendants' attorney sets forth other conferences had with the Examiner. In addition to an interview on April 10, 1963, he refers again to the interview of January 17, 1963 and the substance of that communication and the amendment submitted as a result of that conference on January 23, 1963. He then asserts as follows:

"Having submitted the amendments and not having heard from the Examiner, the Examiner was contacted by telephone on March 4, at which time he informed applicant's attorney that one of the patents listed in the amendment, namely, British Patent No. 603,191, appeared to be more pertinent than he had initially thought it to be and suggested an interview on March 7. During the interview on March 7, it was agreed that at least certain of the claims were inaptly phrased and did not present the claimed invention in the best language. As a result of this interview this supplemental amendment was prepared and presented to the Examiner during the interview on April 10 at which time the claims were discussed and the Examiner indicated that he considered them allowable over the references cited both during the prosecution of the application as well as those set forth in the amendment dated January 18, 1963." (Id. at 71–72.)

The only statement, however, by the Examiner is contained in a communication dated April 24, 1963, in which the following is set forth: "2. Interference No. 89,155 in which this application was involved having been terminated by a judgment favorable to applicant, ex parte

prosecution of the instant application is resumed" (Id. at 77). The communication then states that claim 23 (the count in issue) was cancelled. (Id. at 78)

Defendants assert "[c]ancellation of Claim 23 was required because the Patent Examiner had taken the position that the subject matter as defined in Claim 23 and accordingly the interference count was not patentable [in view of British Patent No. 603,191]. (Vassil Affidavit at 8.) [1]

Plaintiff on the other hand contends that at no point is there a statement in the record either directly or by implication by the Examiner, as defendants claim, that claim 23 was not patentable. (See Rule 2; Amdur Patent Office Rules & Practice § 2.2 (1959); see also Toulmin, Handbook of Patents, ch. V § 7 (1954). In addition, even in the "remarks" of defendants' attorney appearing after the amendments there is no such statement ascribed to the Examiner, but rather the view that certain of the claims "were inaptly phrased and did not present the claimed invention in the best language." (Vassil Affidavit, Exh. A–3, at 71.) Moreover, there is no specification as to which claims were so "inaptly phrased." Though plaintiff has admitted that, at a conference with the Examiner on other matters, the Examiner's attention was called to a prior British patent thought to be pertinent to the interference count (Vassil Affidavit, Exh. A–5, ans. 6), and that one of its representatives expressed the view to the Examiner that the count might not be allowable over the British Patent specification No. 603,191 (id. at ans. 12), there does not appear to be any definitive holding by the Examiner as to that fact. Furthermore, the only other support for defendants' assertions with respect to the view of the Examiner that claim 23 was not patentable is that contained in another affidavit prepared by an attorney of defendants directly involved in the prosecution of the application (Gregory Affidavit, May 2, 1964, in support of the motion).

Plaintiff asserts the following to be material facts to which there is a genuine issue to be tried:

(a) ex parte prosecution was resumed not shortly after the decision of the Board of Interferences on August 28, 1962 but rather April 24, 1963 (see plaintiff's statement pursuant to Rule 9(g) of the General Rules of United States District Courts for the Southern & Eastern Districts of New York (hereinafter referred to as 9(g) Statement ¶ 4); defendants assert that it is an undisputed fact that shortly after the decision the application was remanded for ex parte prosecution. (Defendants' 9(g) Statement ¶ 3.)

(b) the Patent Examiner held the count to be nonpatentable in view of the disclosure in British Patent No. 603,191. (Compare plaintiff's 9(g) Statement ¶¶ 5, 6 and 8, with defendant's 9(g) Statement ¶¶ 4, 5, 6 and 7.)

In reply to plaintiff's 9(g) statement, defendants reassert their position with respect to this issue in the following manner:

"The exact date upon which prosecution of the Foster application was resumed is *not* a material fact. Even if it were Plaintiff's statement that it was resumed on April 24, 1963 is clearly a misstatement as shown by the file of the Foster application in the Patent Office (Exhibit A–3 and *Plaintiff's* opposing papers). The file of the Foster application shows that the Examiner in charge of the application had assumed jurisdiction over it at least as early as January 17, 1963 because on that date defendant Foster's attorneys confer-

---

1. On the question of the patentability of a count in issue, see, generally, Rules 232, 237, 259; Amdur Patent Office Rules & Practice §§ 232.3, 232.5, 237.1–.3, 259.1–.2 (1959); Rivise & Caesar, Interference Law & Practice, §§ 235, 309– 311, 327, 328 (1943); id. at §§ 811– 813 (1948). It should be noted that the resolution of the issue in all the situations just cited in *inter partes* in adversary proceedings.

red with the Examiner concerning the application. * * *" (Id. at ¶ 4.)

In support of this statement, defendants cite the allegations of two of their attorneys. There is, however, no citation to any statement by the Examiner. Thus in seeking to dispel the existence of a dispute as to a fact defendants merely reaffirm its existence.

With respect to the alleged holding of the Examiner, that claim 23 was unpatentable, defendants again cite a paragraph in the affidavit of their attorney.

Thus there appears to be ·a genuine dispute between the parties as to whether the Examiner in fact stated that the count was unpatentable in view of the prior British Patent or that the language was merely inaptly phrased and as such was rewritten.

In any event, claim 23 does not now appear in the patent as issued and thus none of the claims in the patent is the same as the count in issue in the interference at least insofar as exact wording is concerned. In view of that fact, defendants, in support of their motion, argue that the determination of priority in the interference proceeding, from which this action was taken, "disappeared and is no longer in existence" and that a decision by this Court on whether plaintiff is entitled to priority with respect to the count in issue in the interference has thus become moot. "The count which Plaintiff, by its Complaint, prays be awarded to it, though in existence at the time this action was instituted, is no longer in existence, because Defendant S. W. Farber, Inc. and Defendant Foster cancelled the claim in the said Foster patent application Serial No. 471,-949 corresponding to said count. The question of who should now be awarded priority of the count is, therefore, moot." (Notice of Motion ¶ 7.)

"The rules of the Patent Office provide the procedure for a declaration of interference, the definition of the issues on the interference, the determination of the issue and for appeals therefrom. See Patent Office Rules (37 C.F.R. §§ 1.201 to 1.286, 35 U.S.C.A.Appendix). The initial determination as to whether an interference exists is made by the Patent Office. If it determines that interference does exist the Office suggests to the parties a definition of the claim, and the language of the counts of the interference, which are 'such claims as are necessary to cover the common invention in the same language.' Rule at § 1.203. This was done in the instant case." Sperry Rand Corp. v. Bell Tel. Lab., Inc., 171 F.Supp. 343, 345 (S.D.N.Y. 1959).

Rule 201, in defining an interference, provides that: "(a) An interference is a proceeding instituted for the purpose of determining the question of priority of invention between two or more parties claiming *substantially the same patentable invention* and may be instituted as soon as it is determined that *common patentable subject matter* is claimed in a plurality of applications * * *." (Emphasis added.)

Rule 203 similarly provides that "[b]efore the declaration of interference it must be determined that there is common patentable subject matter * * *. Claims in the same language, to form the counts of the interference, must be present or be presented, in each application." (See Amdur, Patent Office Rule & Practice § 203.1 (1959).)

Pursuant to Rule 203, the Examiner suggests to the parties a claim or claims so that the claims that will form the count or counts be presented in the same language. The suggestion, of course, carries with it great weight and amounts in fact to compulsion to make the claims formulated by the Examiner. (See Amdur, supra, § 203.6 at 1033–34; Rivise & Caesar, Interference Law & Practice § 26 (1940).) The procedure thus employed is an attempt to reduce ·the issue of the common patentable subject matter of the interfering applications to the minimum number of claims necessary to cover the common invention. Rule 207(a) specifically provides that "the is-

sue of the interference * * * shall be clearly and concisely defined in only as many counts as may be necessary to define the interfering subject matter."

In order to achieve this end, a motion period is set during which motions are made to amend the interference by putting in issue claims which should be made the basis of interference between the parties. When such motions are made it is incumbent upon the moving party to set forth "[t]he reason why an additional count is necessary * * * and when more than one count is proposed, the motion must point out wherein they differ materially from each other and why each proposed count is necessary to the interference." (Rule 233(d). See Rivise & Caesar, supra, at § 280.) The Manual of Patent Examining Procedure, Section 1105.03 (3d ed. 1961), in pertinent part reads as follows:

"Also care should be exercised in deciding motions under Rules 233 and 234 that any counts to be added to the existing interference are patentably distinct from the original counts and from each other and that counts of additional interferences are likewise patentably distinct from the counts of the first interference and from each other. * * * The phrase 'patentably distinct' as used herein means sufficiently distinct to support separate patents in the event of a split award of priority." (See Amdur, supra, at § 233.3.)

■ Thus it appears that in passing on the propriety of an amendment to the interference the amendment must be patentably distinct from the count in issue, the same as in the declaration of interference wherein each count of the issue must be patentably distinct from the others. (Amdur, supra, § 209.1 at 1066; see Rivise & Caesar, supra, at §§ 226, 227.)

In fact, in the case at bar the Examiner rejected three amendments by Foster, one of which is quite similar to one of the claims in the Patent, on the grounds that they were not patentably distinct from the count in issue.

"The purpose of the rule permitting amending the issue is to provide a means for relieving against estoppel by judgment. * * * Rule 109 [now Rule 233] was promulgated in view of the decisions of the Court of Appeals of the District of Columbia in Blackford v. Wilder, [1907 C.D. 491] and Horine v. Wende [1907 C.D. 615] in which the court refused to consider a second interference for the purpose of permitting applicants to present claims covering all the patentable subject-matter common to the interfering applications." (Amdur, supra, § 233.3 at 1185.)

■■ It is thus important to reduce to a minimum the counts in issue and to require that the counts sought to be added be patentably distinct from each other, because if not distinct a determination of priority with respect to the count in issue will necessarily cover the other as well. Furthermore, even after a decision has been rendered as to priority, the winning party "may be allowed additional claims and claims which dominate the interference. The Commissioner has stated that no sound reason exists why the successful applicant in an interference proceeding may not thereafter present *additional claims to the common subject matter*. On the contrary, this would amount to a holding that when two applicants have been involved in an interference and priority has been awarded to one of them he may patent only such claims common to the two cases as actually constituted counts in the interference. It is not only customary but is highly desirable to select a few representative claims as counts in an interference proceeding. To adopt any other practice would result in needless multiplication of interference counts." (Amdur, supra, § 266.1 at 1361; see id. § 267.1 at 1364–65.)

■ In Blackford, supra, the Court, in very broad and sweeping language, held that "no claim should be allowed to the defeated party which could *by any latitude of construction* be held to em-

brace matter common to the structure of both parties to the interference." Id, at 496. (Emphasis added.)

In view of that fact, it is clear that an applicant, who has been finally adjudicated not to be the first inventor of subject matter common to his application and the similar application of another claimant, cannot thereafter obtain a patent for either that subject matter or for claims which define nothing patentable over that subject matter. Smith v. Watson, 95 U.S.App.D.C. 52, 218 F.2d 863 (1955); United States Rubber Co. v. Coe, 79 U.S.App.D.C. 305, 146 F.2d 315 (1945); In re Cole, 82 F.2d 405, 408–409, 23 CCPA 1057 (1936).

The holding of Blackford, supra, was subsequently followed by the Court of Customs & Patent Appeals, thusly: " * * * Blackford v. Wilder is authority for a settled rule of law in patent interference proceedings that to the winner belongs all the common subject matter contained in the disclosures of all the parties." In re Hoover Co., 134 F.2d 624, 628, 30 CCPA 927 (1943). This has been followed in a myriad of cases thereafter.

In the context of our case, it would thus appear that the issue to be determined is not whether the exact language of the count has been incorporated into the patent but rather whether the common patentable subject matter has been so incorporated. To follow defendants' argument, a patentee could very easily circumvent the statutory review of determinations by the Board of Interferences provided in Section 146 of Title 35 of the United States Code. By changing, ever so slightly, the language of the count in interference, and thereby "cancelling" the count, the question of priority could thus always become moot and a losing party below would never be afforded the opportunity to have a review on the matter of priority.

If we assume, as we must in view of Blackford and its progeny, that to the victor belongs the spoils, the losing party is forever foreclosed from claiming any subject matter which "by any latitude of construction" is within the common subject matter of the disclosures. In view of that fact, if review of priority with respect to the count (which of necessity must also include the common patentable subject matter since the count is a precise embodiment of that common patentable subject matter) is foreclosed by a "cancellation" of that count, then a Section 146 proceeding is without force and effect.

It should be borne in mind that " '[i]t is the substance of things and not the shadow with which we deal.' " Blackford v. Wilder, supra, at 497, and that "an interference in fact depends upon the subject-matter disclosed and not merely upon the language of the respective claims." Ibid. Or as more recently put:

"The important consideration is not, as appellees contend, what the Patent Office awarded at the conclusion of the interference proceeding. It is, instead, what the parties to the interference claimed. * * * " Vietti v. Wayne, 78 U.S.App.D.C. 17, 136 F.2d 769, 770 (1943).

The material issue thus to be decided prior to the issue of priority is the relationship between the claims submitted by the respective parties, the patent subsequently issued, the British Patent No. 603,191, and the count in the interference proceeding.

Plaintiff asserts that "[t]he supplemental amendment of April 12, 1963 rewrote four of the claims (including claim 23, the interference count) so as to differ in only minor respects from the former claims and added an additional claim which rewritten and added claims are now claims 5, 8, 9, 12 and 15 of Foster patent No. 3,095,498." (Wyss Affidavit at 14.) Plaintiff's attorney further asserts that "[h]e has carefully studied the claims of Foster patent No. 3,095,498 and the disclosure of the Jepson & Hill application and that at least claims 2, 3, 4, 5, 6, 7, 9 and 15 of the Foster application are supported by the Jepson & Hill disclosure and therefore are directed to common patentable subject matter and that none of these claims, nor any of the

other claims in the Foster patent, are patentably distinct from the interference count. * * *" (Id. at 14–15.)

Plaintiff then cites the statement in the "remarks" by defendants' attorney following the amendment of April 14, 1963, that the claims did not present the invention "in the best language" and were merely "inaptly phrased."

Defendants, on the other hand, assert that none of the claims in the Patent is the same as the count in issue. While this is admitted by plaintiff insofar as precise language is concerned, it strenuously argues that the Patent as issued is covered by the disclosures of the Jepson & Hill application and is directed to common subject matter.

There thus appears to be a material question as to which there is substantial dispute between the parties.

The remaining question is whether the issue so presented is one of fact or of law and, as a corollary thereto, whether it can be disposed of by a motion for summary judgment.

▮▮▮ The ⸱ Court approaches the matter of a motion for summary judgment in patent cases with the long list of prior precedents in this Circuit in mind. These precedents are collected by Judge Herlands in Servaas & Co. v. Dritz, 185 F.Supp. 61 (S.D.N.Y.1960) wherein he stated as follows:

"In this circuit the courts have frequently reiterated the proposition that summary judgment may not be granted where there is the slightest doubt as to the facts. [citing cases]

"That general policy has been particularly emphasized in patent infringement cases. In patent infringement litigation, the court must exercise unusual caution before disposing of the case summarily. [citing cases]

"Summary judgment will not be granted in a patent infringement case where, for example, the court lacks necessary special knowledge; or where it is desirable to hear expert witnesses and to hear them cross-examined; or where there are conflicting affidavits as to differences and similarities in construction and function; or where there are conflicts concerning the meaning of the specifications and claims, the interpretation of the file wrapper and the Patent Office action, and the significance of the prior art. It cannot be said in this case that to deny the motion 'would be an absurd waste of time and effort.' See Vermont Structural Slate Co., Inc. v. Tatko Bros. Slate Co., 2 Cir., 1956, 233 F.2d 9, 10." (Id. at 63.)

This philosophy was very recently affirmed by Judge Wyatt in Kollsman Instrument Corp. v. Astek Instrument Corp., 225 F.Supp. 534, 536 (S.D.N.Y. 1964): "[m]oreover, summary judgment is very rarely proper in a patent case where as here the field is technical, the experts are in disagreement, the position in the art of the patent in suit must be understood, the commercial effect of the patent in suit may be relevant, etc. These considerations have shaped an attitude of extreme caution—at least in this Circuit—in granting summary judgment in patent cases. [citing cases]" Compare Ronel Corp. v. Anchor Lock of Florida, Inc., 325 F.2d 889 (5th Cir. 1963); Ballantyne Instruments & Electronics, Inc. v. Wagner, 227 F.Supp. 394, 395 (S.D.Ohio 1964).

▮▮▮ There is authority for the proposition that the construction of claims of the respective applications and/or patents is an issue to be determined by the Court as a matter of law. "The interpretation of the claims of a patent is not to be determined by the opinion of experts, but is a question of law for the court." Solomon v. Renstrom, 150 F.2d 805, 808 (8th Cir. 1945). Accord, Sanford v. Kepner, 99 F.Supp. 221 (M.D.Pa.1951). However, that fact does not compel this Court to decide such an issue on a motion for summary judgment. For, in each of the cases cited above, expert testimony was taken to assist the Court in reaching its determinations, and none was disposed of on a motion for summary judgment. See Reiser v. McKee Glass Co., 1 F.R.D. 170 (W.D.Pa.

1940). While the Court is, of course, not bound by this expert testimony, it can accept it as advisory or rely rather heavily on it as the situation warrants. Hansen & AFSCO, Inc. v. Siebring, 231 F.Supp. 634, 644 (N.D.Iowa 1964). But in any event the issue should not be resolved absent such testimony.

There can be no doubt that, in the area of patent law where the issues to be resolved are not simple and obvious to the untrained eye, expert testimony can be most helpful in reaching a just solution to the issues presented. See S. W. Farber, Inc. v. Texas Instruments, Inc., 230 F.Supp. 883 (D.Del.1964).

Accordingly, I am of the view that the issue presented herein, to wit, the scope of the patent issued as compared with the applications and disclosures therein of the respective parties, the count in the interference and the British Patent No. 603,191, is not one to be disposed of summarily and the motion for summary judgment is thus denied.

Settle order on notice in conformity herewith.