Domenico MASTINI, Plaintiff,

v.

AMERICAN TELEPHONE AND TELE-GRAPH COMPANY and Western Electric Company, Defendants.

Domenico MASTINI, Plaintiff,

v.

NEW YORK TELEPHONE COMPANY, Defendant.

United States District Court
S. D. New York.
Dec. 14, 1964.

Michael I. Borsella, New York City, for plaintiff.

Henry R. Ashton, New York City, for defendant.

RYAN, Chief Judge.

This suit charges infringement (35 U.S.C. § 271 et seq.) of claims 1, 2 and 3 of U. S. Patent No. 2,129,332, issued on September 6, 1938 to Domenico Mastini for a combination radio-telephone system. Plaintiff alleges that several of the defendants' systems come within the above claims or, in the alternative, are the equivalent of his patent.

Defendants move under Rule 56, F.R. Civ.P. for summary judgment. We have before us on this motion a stipulation of undisputed facts and plaintiff's answers to interrogatories propounded by defendants.

The Mastini patent in suit discloses and claims a particular type of radio-telephone system.

These systems have long been used to extend ordinary wire line telephone service to points geographically inaccessible for wire lines. Such a system requires only a local radio transmitter and receiver, connected with telephone wire line network, which can communicate by radio with a remote radio-telephone station, which itself includes a transmitter and receiver. A conversation received by radio from the remote radio-telephone station is forwarded into the telephone wire line network, thus enabling the person at the remote radio-telephone station to call any ordinary telephone.

It is in essence the defendants' contention that defendants' accused systems all differ from Mastini's in a fundamental respect—the location and operation of the local radio transmitter and receiver. We find that there is no infringement and that the plaintiff is estopped from claiming equivalence. Summary judgment is granted for defendants.

Plaintiff, on this motion, has stated that the elements of his invention are embodied in Fig. 1 of the patent and that this drawing "is a schematic view exemplifying the general principles of the invention." In the explanation of Fig. 1, it is disclosed that the invention consists of a telephone substation, which is attached to a telephone central station

by the wire lines of a telephone network. At the substation, there is an ordinary telephone apparatus. Associated with the substation is a radio transmitter and receiver, the latter being a radio-to-wire line repeater, both the transmitter and receiver forming part of apparatus called a "complex" in the patent. This complex is correlated with a remote radio complex, which also contains a transmitter and receiver. When the remote radio activates the substation's complex, the local transmitter and receiver is connected to and the ordinary telephone apparatus at the substation disconnected from the wires of the telephone system. This enables the remote radio to communicate via the substation complex and the central station with any telephone subscriber. Conversely, a call coming from the other direction can also activate the complex at the substation and complete the circuit in a similar fashion.

The defendants' network has been stipulated by the parties to be embodied in the "1955 Mobile Telephone System". In this network, calls from or to a remote radio are received or transmitted by a radio complex in a control terminal, which is attached by wires to a Toll Switchboard. At the Toll Switchboard, which is in turn attached to a Local Switchboard, there is a mobile telephone operator, who accomplishes the routing of the calls.

Plaintiff's first contention is that the defendants' system contains all of the elements of his invention. There is a remote radio, a central station, and a local radio complex in the central terminal, which is associated with the toll switchboard. The operator's headset and mouthpiece, dial and signal lamp, it is argued, are the "usual telephone apparatus," which together with the switchboard constitute a "telephone substation."

Secondly, plaintiff contends that the fashion in which the defendants' system functions is an infringement of his patent claims.

The operation of plaintiff's system is described in the following language:

"*  *  * means whereby radio signals received by said local receiving apparatus from said remote radio transmitter cause the disconnection of the local substation from the wire lines and the connection of the radio receiving apparatus thereto instead." (Claim 1)

According to plaintiff, the defendants' mobile operator is the "means" for accomplishing the "disconnection" and "connection" set out in the claims. When "radio signals" activate the control terminal, a light flashes at the switchboard. This "causes" the operator to insert first one jack-plug which connects her to the radio transmitter and receiver in the Control Terminal, and then a second to the wire line leading to the Central Station. This completes the "connection" of the radio transmitter and receiver to the wire lines. The operator then dials the station called and after the party called responds, she "causes" the "disconnection" of her telephone set from the wire lines leading to the central station by turning a key switch.

Plaintiff argues that although "in the schematic illustration of Fig. 1, which illustrates the general principle of the invention, no specific mechanism is illustrated for operating the selective connect-disconnect switch", "it is obvious that well known alternatives for accomplishing such connect-disconnect switching may be used, such as manual switches, jack plugs and sockets; or relays."

Plaintiff also invokes the Doctrine of Equivalence. He alleges that his system is a pioneer invention and, therefore, the patent should be construed liberally. He argues that, even if the elements and the "means" of defendants' system are not literally within his claims, the Court should invoke its equity powers to deem them the equivalent of the claims.

Defendants' position is that the patent specifications and file wrapper make it clear that the "local telephone substation"

of the Mastini claims refers only to a subscriber's ordinary telephone. Furthermore, defendants contend that the patent is strictly limited, by file wrapper estoppel, to a fully automatic system and does not include a system where there is a manual "means".

The elements of plaintiff's invention as set out in Claim 1 are:

"In combination, a remote radio transmitter, a local telephone sub-station, a central station, wire lines normally interposed between said local substation and said central station, local radio receiving apparatus and * * *."

According to the literal meaning of this claim, the elements of defendants' network can be read to be within plaintiff's patent. There is no indication that "a local telephone substation" cannot be a telephone switchboard with an operator.

The portion of the claims, which describes the operation of the invention, however, indicates that a fully automatic system is envisaged, and that the defendants' network utilizing a telephone operator does not infringe. The claims read:

"Means whereby radio signals * * cause the disconnection and the connection * * *". Claim 1

" * * * means responsive to an incoming radio signal * * * for causing the sub-station to be disconnected * * * and for causing the connection * * *." Claim 2

" * * * means whereby a signal * * * after demodulation by said local receiver, causes the disconnection * * * the connection * *". Claim 3

The language of Claims 1 and 3 reads that the "radio signal" itself "cause(s)" the "disconnection" and "connection". Claim 2, however, is more ambiguous in that the "means" can be interpreted as "causing" the "disconnection" and "connection" instead of the "radio signal".

In any case, defendants' accused system appears to be excluded from the claim language because in the claims the "sub-station" is "disconnected" from the "wire lines". The plaintiff states in his "Memorandum in Opposition" (p. 23) that defendants' Toll Switchboard and the conventional telephone apparatus located there correspond to the "local telephone sub-station" of the claims. In explaining the operator's function, however (pp. 31–32 Plaintiff's "Memorandum in Opposition"), plaintiff states:

" * * * the operator disconnects the rest of her own telephone set (the earpiece and microphone) from these wire lines * * *."

This indicates that in the defendants' system, as interpreted by plaintiff, only the "telephone set" but not the "sub-station" is "disconnected".

This apparent lack of infringement is not sufficient to grant summary judgment, however, because the meaning of "sub-station" and "means" is ambiguous from an inspection of the claims alone. The meaning of these words is further elucidated in the patent explanation and description, preceding the claims, and in the File Wrapper History. It is to this we turn our attention, mindful that the claims define the scope of the patent; and that the description stated in the claim is an illustration of one use of the invention. Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935); Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961); Reiner v. I. Leon Co., 324 F.2d 648 (2 Cir., 1963).

However, there seems to be authority that the claims are to be interpreted in light of the description. Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132 (1940); International Latex Corp. v. Warner Bros. Co., 276 F.2d 557 (2 Cir., 1963).

Where, as here, important claim terms (such as "sub-station" and "means") are ambiguous, the description must be read to aid their interpretation.

There is evidence in the explanation and description that Mastini meant a

"subscriber's station" by "telephone sub-station" and automatic electric relays by "means". At the beginning of Mastini's explanation of his invention, he stated:

"My arrangement requires no change at the central telephone plant; the only change which is required being at the individual subscriber's stations where there is added what I call a 'complex', which is used instead of the ordinary individual telephone instrument, there being a conversation connection combined with said 'complex'."

In Fig. 2, Mastini diagrams in great detail automatic relays which accomplish the principles of his invention explained in Fig. 1. Nowhere does he mention that the circuits between the subscriber's telephone with its radio complex and the wire lines leading to the telephone central can be accomplished manually. When he mentions a manual telephone network, after describing the electric relays, he refers to a network where the operations at the telephone central are manual, and not those which "connect" and "disconnect". The connection with the central exchange is still accomplished automatically "in the manner described previously * * *".

■ The intended meaning of "sub-station" and of "means" is further indicated by the "File Wrapper History", the correspondence between Mastini and the Patent Examiner. Reference to the file wrapper is now had by us to give the claims the meaning which was intended by the applicant and understood by the examiner. Zenith Radio Corp. v. Lehman, D.C., 121 F.Supp. 69, aff'd 2 Cir., 217 F.2d 954 (1955); I. T. S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 47 S.Ct. 136, 71 L.Ed. 335 (1926).

It has been held, however, that in considering the file proceedings "we do not look at the arguments of the applicant to the examiner." A. G. Spalding & Bros. v. John Wanamaker, 2 Cir., 256 F. 530, 533 (1919); Westinghouse Electric & Manufacturing Co. v. Condit Electric

Mfg. Co., 194 F. 427, 430 (1911); Auto Pneumatic Action Co. v. Kindler & Collins, 2 Cir., 247 F. 323, 328 (1917); General Electric Co. v. P. R. Mallory & Co., 2 Cir., 298 F. 579, 586 (1924). We look to the file wrapper in our inquiry only to ascertain the changes in the claims and the examiner's reaction to them.

To understand the meaning of "sub-station" and "means", it is first necessary to appreciate the importance of "disconnection" in Mastini's combination. The evolution of the file wrapper claims reveals that "disconnection" distinguished the invention from the prior art.

None of the seven claims in Mastini's application as originally filed were limited to the automatic-disconnect features; all were rejected on prior art; he cancelled all seven and submitted new claims 8–11, likewise not limited; again all were rejected on prior art and were finally cancelled.

Then, claims 12–21 were submitted together (pp. 35–39 File Wrapper). Claims 12–14 and 17 were subsequently approved with some slight changes and became final claims 1–3 (pp. 48 and 64 File Wrapper). The remaining claims (15, 16, 18, 21) were rejected due to prior art (p. 48 File Wrapper) and were subsequently cancelled (p. 51 File Wrapper). All of the claims contain the same basic elements except that the accepted claims contain a "sub-station" normally connected to the wire lines. In the rejected claims, there is an activation of the local radio complex, or the local radio complex is energized and connected to the wire lines from the central station. In the accepted claims, however, not only is the local radio apparatus connected to the lines but the sub-station is simultaneously disconnected therefrom.

Application Claim 12 became patent Claim 1 and it specifically limits the patent to the automatic-disconnect feature. Patent Claim 1 refers to

"means whereby radio signals received by said local receiving apparatus from said remote radio transmitter cause the disconnection

of the local sub-station from the wire lines and the connection of the radio receiving apparatus thereto instead."

Following rejection, Mastini then cancelled application claims 15, 16, 18 and 21, and submitted application claims 22–28.

The history of claims 24 and 25 illustrates the importance of "disconnection". As originally introduced to the Patent Examiner (p. 52 File Wrapper), there was a radio transmitter and receiver disposed in "proximity to the ends" of wire lines which were connected to these lines upon receipt of a radio signal. Both of these claims were rejected "as fully met in Williams, et al." (p. 63 File Wrapper). Subsequently, Mastini amended these claims (pp. 52 & 65 File Wrapper) by including a "sub-station" normally connected to the wire lines extending to the central station. This sub-station was disconnected from the lines by the same means which connected the local radio transmitter and receiver. These amended claims were accepted by the Patent Examiner, and in this form became Claims 6 and 7.

In all accepted claims, the act of "disconnection" was the factor which distinguished Mastini's invention from the prior art. The inclusion of a "sub-station" was not sufficient to enable a patent to be granted. This is shown by the rejection of Claim 15 (p. 48 File Wrapper), where the examiner said:

"Claim 15 is rejected as being unpatentable over Williams et al. There is no invention in providing a telephone substation associated with the Williams' radio station and normally connected to his central station".

The act of disconnection was present in all accepted claims and, where absent, the claims were rejected due to prior art.

The history of the file wrapper claims, also, compels the conclusion that the nub of Mastini's patent was the automatic method used to accomplish the disconnection.

We pause to analyze the history further. The early Mastini claims, while not containing a provision for disconnecting a sub-station from the central station, did explain sets of relays, which would automatically connect local wireless sending and receiving sets to the telephone central. Claims 1–7 (pp. 8 & 9 File Wrapper) comprise "an usual telephone network whereof a number of subscriber stations are provided, besides of the usual telephone apparatus, with receiving and sending sets for the wireless communication with distant wireless sending and receiving stations." Claims 2–7, in addition to the system of Claim 1, include automatic means for producing these telephone circuits. For example in Claim 2:

"* * * the said distant wireless stations being suitably equipped for producing in the telephone apparatus of the network provided with wireless sets the taking off, the calling and the establishing of the wire bilateral conversation circuit."

These seven claims, as we have noted, were rejected (p. 12 File Wrapper) for prior art. Following this rejection, the new Claims 8–11 (pp. 19–21 File Wrapper) are in essence an articulation of the original seven. Again, wireless transmitting and receiving sets of a fixed subscriber's station are correlated with a remote wireless transmitter and receiver. When the local complex is activated, relays automatically close the battery circuit of the central station, dial the selected number, and when the called station answers, complete the voice circuit to the called station. Therefore, as in the previous claims, the local complex is "connected" to the central station, but there is no corresponding "disconnection" of the associated "fixed subscriber's station". These claims were also rejected (p. 27 File Wrapper). One of the reasons given was that they were unpatentable over Williams et al. Once again Mastini withdrew his claims (pp. 29 & 44 File Wrapper) and submitted new claims 12–21 (pp. 35–39 File Wrapper). These new claims, as we have al-

ready seen, contained, instead of a "subscriber's station" a "telephone sub-station" and instead of including electric relays spoke of "means". We have noted before that Claims 12–14 and 17 contain provisions for "disconnecting" a substation and were accepted as patent claims. The "means" language in 12–14 and 17 is identical to the "means" language in the rejected claims, therefore, there is no basis to conclude that Mastini had one conception of "means" for the rejected claims and another for these accepted.

■ The operation in Claims 16 and 18–20 is identical to that of prior Claims 1–11 in that the local radio complex is connected to the central station and enables the remote radio to reach this point. There is no indication that Mastini in these claims intended to change his claims from purely automatic means, as in Claims 1–11, to means which include a manual operation. If he intended to broaden his claims in this fashion, he would have articulated the difference. We conclude that the "means" in Claims 16 and 18–21 are identical to the automatic means explained in Claims 1–11, and that the "means" in Claims 12–14 (Patent Claims 1–3) are likewise automatic.

There is further evidence in the File Wrapper, which shows that the "means" in Patent Claims 1–3 was limited to that accomplished automatically. In presenting Claim 24 (p. 52 File Wrapper), Mastini spoke of "means whereby a signal received by the local radio receiver causes connection to said lines of the local radio transmitter and receiver * * *". This wording is similar to that used in Patent Claims 1–3 and in rejected Claims 18–21, and reads as intending to refer only to automatic means. This conclusion is supported by reference to the language used by the Patent Examiner in rejecting these claims before they were amended to include the "disconnection" feature.

"Applicant has stated in his remarks of July 13, 1937 that Williams et al does not have a substation normally connected to a line which is replaced by a radio receiver and transmitter upon receipt of a radio signal. This may be true, but the rejected claims do not contain the above stated limitations.

"It is to be noted that Williams et al is a fully automatic system. Signals received by the local receiver serve to connect the local telephone central to the local receiver and transmitter * * *." (File Wrapper p. 63)

This language not only emphasizes the importance of the "disconnection" feature of the Mastini patent, but also indicates that both the Patent Examiner and Mastini had automatic "means" in mind. In the first place, the examiner stated: "Upon receipt of a radio signal". This would preclude human intervention. Secondly, the examiner would not have noted that Williams et al. was a "fully automatic system" unless Mastini had urged that his system was automatic so as to distinguish it from Williams. If Mastini were endeavoring to patent a system that was manual and the prior art was automatic, this difference would have been sufficient to sustain his claim of invention; then, it was not necessary to include the "disconnection" feature to secure acceptance of his claims.

Plaintiff has conceded that the manual cutoff jack plug and socket or manual switch were old and well known elements before his invention. The Patent Examiner explained in his rejection of Claim 15 that introduction of a sub-station would not be an invention. The disconnection of the sub-station by already utilized manual means would likewise not constitute an improvement over the prior art.

We read Mastini's invention as limited to a combination which contained a single subscriber's telephone at the sub-station. The early claims spoke of "subscriber's stations" instead of "telephone sub-stations" and there is no indication that this change was meant to have a different significance from that in the prior claims. In addition, as already observed, the ex-

planatory language preceding the patent claims states that "the only change which is required being at the individual subscriber's stations * * *". This use of the same language which appeared in the early claims indicates that the patentee still intended "subscriber's station" by "telephone sub-station". Secondly the claim language cannot be read as applied to a switchboard.

We conclude that Claims 1–3 of plaintiff's patent, as interpreted by the description and as shown by the File Wrapper History, cannot be read to include a system like defendants'; there is no infringement.

 In addition, Mastini is precluded from invoking the Doctrine of Equivalence because of File Wrapper Estoppel. A Court may employ this equitable doctrine where it finds that an infringer has utilized the principle of the invention even though the accused device is outside the literal scope of the claims. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Sanitary Refrigerator Company v. Winters, et al., 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147 (1929).

The applicant is estopped from asserting a construction of a claim, however, if this interpretation has been rejected, abandoned, or amended. A. G. Spalding & Bros. v. John Wanamaker, supra; Baltzley v. Spengler Loomis Mfg. Co., 2 Cir., 262 F. 423 (1919); Van Der Horst Corp. of America v. Chromium Corp. of America, 98 F.Supp. 412 (1951) S.D.N.Y.

The test for File Wrapper Estoppel in this Circuit was defined even more specifically in the Catalin case by Learned Hand. Judge Hand, who also wrote Spalding, supra, said in Catalin:

> " * * * we have steadily refused to look further than to learn this: whether a patentee who seeks to disavow an element of his claim, was forced to introduce it in order to avoid rejection."

Catalin Corp. of America v. Catalazuli Mfg. Co., 79 F.2d 593, 594 (2 Cir., 1935); Katz v. Horni Signal Mfg. Corp., 145 F.2d 961, 963 (2 Cir. 1944).

We find that an examination of the file wrapper in the present case reveals that in "order to avoid rejection" Mastini was forced to introduce an automatic method to accomplish disconnection. He is estopped from claiming that a system that employs manual means is the equivalent of his invention.

We conclude, upon the record before us, that there is no genuine issue as to any material fact in respect to infringement. Defendants' motion for summary judgment is granted; complaint dismissed upon the merits; the Clerk is directed forthwith to enter judgment dismissing this suit upon the merits; so ordered.