**XEROX CORPORATION, Plaintiff,**

v.

**DENNISON MANUFACTURING COM-
PANY and Dennison Copier Cor-
poration, Defendants.**

No. 67 Civ. 3302.

United States District Court,
S. D. New York.

Jan. 8, 1971.

---

Brumbaugh, Graves, Donohue & Raymond, New York City, for plaintiff; Mark N. Donohue, Francis J. Hone, New York City, of counsel.

McLean, Boustead & Sayre, New York City, for defendants; W. Brown Morton, Jr., J. Donald Tierney, New York City, of counsel.

MANSFIELD, District Judge.

In this suit for infringement of two United States patents assigned to and controlled by plaintiff, No. 3,121,006 ("006"), issued to Middleton and Reynolds, and No. 2,588,699 ("699"), issued to Carlson, defendants have moved pursuant to Rule 56, F.R.Civ.P., for partial summary judgment dismissing as a matter of law the claim based on the 006 patent. For the reasons stated below the motion is denied.

Both patents deal with the art of copying documents by means of electrophotography, or xerography, which is used as a basic principle in the copying machines, and paper used therewith, manufactured and sold by the parties in the ever-burgeoning office machine industry. The process utilizes a photoconductive insulating layer (which may be in the form of a coating on paper or on metal called a binder plate), that holds an electrostatic charge in darkness and dissipates or loses so much of the charge as is exposed to light. By charging the plate uniformly in darkness and then exposing it to the image of a document to be copied, a reproduction of the document can be obtained upon the surface of the plate. This result is produced through the dissipation of the electrostatic charge from those areas of the plate that are exposed to the light portions of the document to be copied, leaving on the plate an invisible electrostatic image of the dark lines or print to be reproduced. This invisible image is then developed through use of particles that are electrically attracted to the portions of the surface of the plate that remain charged and through application of heat.

It is immediately apparent that the substance used as the photoconductive insulating layer plays a critical part in the successful use of the process. Claims 1 and 14 of the 006 patent, granted on February 11, 1964, describe an electrophotographic copying process that would dominate the utilization of a

layer consisting of zinc oxide coated on paper.[1] A certain pigment grade of zinc oxide (described in Example 70), which is apparently both efficient and economical for the purpose, is used by defendants with a photoconductive metallic ion-containing inorganic compound dispersed in an insulating organic resin binder. Although plaintiff owns the 006 patent, the machines currently marketed by it utilize a binder plate consisting of a selenium layer coated on a metal backing, from which the developed image is transferred to a paper sheet.

Defendants' answer charges that the 006 patent is invalid and unenforceable by reason of plaintiff's fraud, misstatements, and non-disclosure of material facts in connection with prosecution of the application for the patent before the Patent Office, as a result of which it is alleged that plaintiff comes into court with unclean hands.

For purposes of this motion defendants concede that since fraud (which they contend that they will prove at trial) requires clear, convincing and unequivocal proof of willfulness and intent on the part of plaintiff, Barr Rubber Products Co. v. Sun Rubber Co., 425 F. 2d 1114 (2d Cir. 1970); Scott Paper Co. v. Fort Howard Paper Co., 432 F.2d 1198 (7th Cir. 1970), and that since summary judgment may not be used to determine intent, Preston v. United States Trust Company of New York, 394 F.2d 456, 460 (2d Cir. 1968); Louis Schlesinger Company v. Kresge Foundation, 388 F.2d 208, 212 (3d Cir. 1968); see Poller v. CBS, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), their defense of fraud presents at best a genuine issue as to plaintiff's state of mind, which bars summary judgment based upon fraud. However, invoking decisions more fully discussed below, defendants contend that they should be awarded summary judgment for the reason that because of plaintiff's conduct before the Patent Office the latter was denied the opportuni-

---

1. The 699 patent which relates to a method of applying the electrostatic charge by an ion-producing source is not at issue on this motion.

ty to exercise its administrative judgment with respect to material facts potentially determinative of patentability. To put it another way, defendants contend that whether or not there was a wrongful or fraudulent intent on the part of the prosecution of the 006 patent, plaintiff's conduct (misstatements, failure to disclose relevant facts, appropriation of disclosures made by others and presentation of a false oath) amounted to unclean hands as a matter of law.

Plaintiff denies any unfair conduct or misrepresentations on its part in the prosecution of the 006 patent and raises numerous issues of fact. More important for our purposes plaintiff disputes defendants' basic assumption that the doctrine of unclean hands may be invoked without proof of *intentional* misstatements or omissions of material or relevant facts. Before proceeding to this question, we turn to some of the undisputed background facts.

The art of electrophotography was pioneered by Chester Carlson in the late 1930's and early 1940's. In 1944 the Battelle Memorial Institute ("Battelle"), a research organization in Columbus, Ohio, agreed with Carlson to support further development work in its laboratory. In 1947 plaintiff's predecessor, Haloid, entered into an agreement with Battelle whereby plaintiff contributed to the research project and acquired commercial rights in the fruits of the research, including any inventions. The research work was furthered by the negotiation in 1948 of a contract with the U.S. Army Signal Corps to determine whether electrophotography was suitable for a particular type of Signal Corps high speed, continuous tone photography being developed. Thereafter Battelle and plaintiff investigated numerous substances for the purpose of determining whether they might, like the selenium, be suitable for use as a photoconductive insulating layer. Insofar as this research work was performed pursuant to the Signal Corps contract, some substances, while unsuitable for such use in connection with the Signal Corps continuous, rapid photography (which required a high speed, panchromatic subject matter), might still be useful for ordinary electrophotographic copying. (Some of the differences between the parties as to the interpretation of certain Battelle reports seem to arise out of this distinction in possible uses of the subject matter.)

In October 1948 Battelle and plaintiff put on a public demonstration of the electrophotography process in Detroit, Michigan. Thereafter RCA, which was also working on development of an electrophotographic copying process, gained access to reports of research done for the Signal Corps at Battelle on electrophotography. Later Greig, an RCA employee, was to claim as his invention the use of the zinc oxide photoconductor.

Middleton and Reynolds, the inventors named in the 006 patent, were employed by Battelle in its research on electrophotography, including the investigation of substances suitable for use as photoconductors. On May 25, 1949, a patent application (M–1) was filed by Middleton, which broadly claimed photoconductive insulators in a binder and recited a series of different substances, including zinc titanate, as possible insulators. On September 25, 1952, a patent application (M–2) was filed by Middleton and Reynolds, which eventually led to the issuance of the 006 patent. As originally drawn M–2 disclosed and claimed binder plates in which the photoconductive material would consist of an inorganic compound. A large number of different sulfides and selenides of cadmium and zinc, and of different phosphors, were described.

In the meantime, by May 1952, Greig of RCA had used a pigment grade of zinc oxide as a photoconductive material (plaintiff claims that Greig and his superior Young had obtained the idea of zinc oxide from their examination of the Seventh Quarterly Progress Report of work done at Battelle for the Signal Corps). In the same month RCA, which was seeking cross-licensing agreements

from plaintiff, disclosed to plaintiff that RCA was working on a type of paper for use as a photoconductive insulator in its electrographic process and after a demonstration in December 1952, which was witnessed by plaintiff's representatives, RCA disclosed that the paper was coated by a pigment grade of zinc oxide. By August 1953, RCA delivered to plaintiff the formulation for the zinx oxide plate.

On November 6, 1953, plaintiff amended the M–2 application to claim generally the use of binder plates containing inorganic compounds and included specific reference to a zinc oxide coated plate as a photoconductor. There followed a prosecution by plaintiff of the M–2 application before the Patent Office, including the filing of a continuation-in-part (M–3) in 1954, which included numerous added examples, one of which, No. 70, described a plate using the same pigment grade of zinc oxide that had been used by Greig. After the Patent Examiner in 1957 rejected the application on the basis of Greig's earlier application filed on September 29, 1951, plaintiff filed an affidavit of its patent counsel, Simmons, swearing back of the Greig date on the basis of earlier work done on zinc oxide at Battelle. The M–3 application was rejected by the Patent Office but upon appeal the Court of Customs and Patent Appeals reversed the Patent Office and granted the 006 patent.

It is against the foregoing background that defendants' motion for summary judgment must be considered. Two basic grounds are asserted. The first is that plaintiff's conduct before the Patent Office, including alleged misstatements and non-disclosures of material and relevant facts, the appropriation of disclosures made by plaintiff by RCA, and the presentation of an alleged false oath to the Patent Office, amounted to

fraud or unclean hands precluding enforcement of the patent as a matter of law. As a second basis for their motion, defendants seek summary judgment on the ground that the 006 patent is invalid because plaintiff represented that Middleton and Reynolds were the joint inventors of the zinc titanate-containing binder plate described in the M–1 application, whereas in fact they did not reduce that invention to practice and Reynolds never had done any work on it.

## DISCUSSION

■ In considering defendants' motion for summary judgment, we are governed by the basic principle that defendants bear the heavy burden of showing that no genuine issue exists as to any material fact necessary to establish defenses entitling them to dismissal as a matter of law. Dolgow v. Anderson, 438 F.2d 825 (2d Cir. Sept. 2, 1970); Kletschtka v. Driver, 411 F.2d 436 (2d Cir. 1969); Lemelson v. Ideal Toy Co., 408 F.2d 860, 863 (2d Cir. 1969); Amer. Mfgrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres Inc., 388 F.2d 272, 278–280 (2d Cir. 1967); United States v. Farr & Co., 342 F.2d 383, 385 (2d Cir. 1965); Cross v. United States, 336 F.2d 431 (2d Cir. 1964); Applegate v. Top Associates Inc., 300 F. Supp. 51 (S.D.N.Y.1969). As the Second Circuit Court of Appeals recently stated in Dolgow, supra, "A litigant has a right to a trial where there is the slightest doubt as to the facts," quoting from Judge Frank's opinion in Doehler Metal Furniture v. United States, 149 F.2d 130, 135 (2d Cir. 1945). The reluctance to grant summary judgment in patent cases is evidenced by a survey revealing that such motions have been granted in only seven reported instances since 1956, and in all of these patent cases the subject matter was simple, without technical complexities and presenting no issue of material fact.[2]

2. Aileen Mills Co., Inc. v. Ojay Mills, Inc., 188 F.Supp. 138 (S.D.N.Y.1960) (a design patent—infringement issue easily resolved by comparison of the accused article with the patent illustration); Mastini

v. American Telephone & Telegraph Co., 236 F.Supp. 310 (S.D.N.Y.1964), affd., 369 F.2d 378 (2d Cir. 1966) (only a legal issue—no factual issue raised); Dal-Bac (Pty) Ltd. v. Firma Astorwerk Otto

On the other hand this Circuit and the courts within it have denied motions for summary judgment in every instance in which factual issues of significance were raised or the subject matter of the patent was sufficiently complex to require the aid of a technical expert in understanding it.[3]

"In patent infringement litigation, the court must exercise unusual caution before disposing of the case summarily. [Citations omitted]

"Summary judgment will not be granted in a patent infringement case where, for example, the court lacks necessary special knowledge; or where it is desirable to hear expert witnesses and to hear them cross-examined; or where there are conflicting affidavits as to differences and similarities in construction and function; or where there are conflicts concerning the meaning of the specifica-

tions and claims, the interpretations of the file wrapper and the Patent Office action, and the significance of the prior art." Ser Vaas & Co., Inc. v. Dritz, 185 F.Supp. 61, 63 (S.D.N.Y. 1960).

Defendants here completely fail to meet the burden assumed by them. With respect to the first ground of their motion—unclean hands—they misconceive the elements that must be proved in order to establish unclean hands as a matter of law. Secondly, even assuming *arguendo* their erroneous assumption as to the governing legal principles, the record fairly bristles with genuine issues of material fact.

Turning first to the elements which defendants must establish in order to sustain the defense of unclean hands, their answer alleges that plaintiff was guilty of fraud before the Patent Office and their briefs are replete with characteri-

---

Berning & Co., 244 F.Supp. 516 (S.D. N.Y.1965) (belt buckle—both parties moved for summary judgment—judge notes that expert witnesses not necessary in such a simple case) ; Marvin Glass & Associates v. Deluxe Topper Corporation, 284 F.Supp. 558 (S.D.N.Y.1967) (a game—no factual issue raised) ; Monaplastics, Inc. v. Caldor, Inc., 2 Cir., 378 F.2d 20 (1967) (a paper towelling rack— no factual issue raised) ; C-Thru Products, Inc. v. Uniflex, Inc., 397 F.2d 952 (2d Cir. 1968) (a bag handle—parties agreed that there were no factual issues) ; Ames Shower Curtain Co. v. Heinz Nathanson, 285 F.Supp. 640 (S.D.N.Y.1968) (a design patent—infringement issue easily resolved by comparison with patent illustrations; parties agreed that there was no factual issue) ; cf. Rains v. Niagua, Inc., 406 F.2d 275, 280 n. 9 (2d Cir. 1969) (a design patent—validity question easily resolved by comparison of patent illustration with prior art; still there was a trial).

3. Vacheron & Constantine-Le Coultre Watches, Inc. v. Benrus Watch Co., Inc., 260 F.2d 637 (2d Cir. 1958) ; Emsig Manufacturing Co. v. Rochester Button Co., 163 F.Supp. 414 (S.D.N.Y.1958) ; Miller v. The Stiffel Co., 158 F.Supp. 762 (S.D.N.Y.1958) ; Reynolds Pen Co. v. W. A. Sheaffer Pen Co., 22 F.R.D. 502 (S.D.N.Y.1958) ; Smith-Corona Marchant Inc. v. American Photocopy

Equipment Co., 214 F.Supp. 348 (S.D. N.Y.1962) ; Tip-Top Products Co. v. Delamere Co., Inc., 133 U.S.P.Q. 150 (S.D.N.Y.1962) (no federal report) ; Kollsman Instrument Corp. v. Astek Instrument Corp., 225 F.Supp. 534 (S.D. N.Y.1964) ; Sunbeam Corp. v. S. W. Farber, Inc., 243 F.Supp. 75 (S.D.N.Y. 1965) ; Leveski v. Hydraulic Elevator and Machine Co., Inc., 243 F.Supp. 614 (S.D.N.Y.1965) ; Tri-Wall Containers, Inc. v. Continental Can Co., Inc., 147 U.S.P.Q. 41 (S.D.N.Y.1965) (no federal report) ; Blisscraft of Hollywood v. Rona Plastics, Inc., 147 U.S.P.Q. 65 (S.D.N.Y.1965) (no federal report) ; Watsco, Inc. v. Henry Valve Co., Inc., 146 U.S.P.Q. 24 (S.D.N.Y.1965) (no federal report) ; Associated Pipe & Fitting Co., Inc. v. Belgian Line, Inc., 247 F. Supp. 757 (S.D.N.Y.1965) ; I.C.E. Corp. v. Armco Steel Corp., 250 F.Supp. 738 (S.D.N.Y.1966) ; Eaton Paper Corp. v. Hudson Photographic Industries, Inc., 156 U.S.P.Q. 669 (S.D.N.Y.1968) (no federal report) ; Robot Education Systems, Inc. v. RCA, 157 U.S.P.Q. 339 (S.D.N.Y.1968) (no federal report) ; Fujitsu Limited v. Sprague Electric Co., 153 U.S.P.Q. 168 (S.D.N.Y.1968) (no federal report) ; Lemelson v. Ideal Toy Corp., 408 F.2d 860 (2d Cir. 1969), rev'g, 286 F.Supp. 993 (S.D.N.Y.1968) ; Faraday, Inc. v. Audio Devices, Inc., 165 U.S.P.Q. 634 (S.D.N.Y.1970).

zations of plaintiff's conduct as amounting to "serious impropriety" and "lacking in candor," ending with the conclusion that "the prosecution of the '006 patent * * * was * * * honeycombed with improprieties *purposely* practiced by plaintiff, its attorneys, and agents" (Reply Br. p. 25; emphasis added). Defendants' papers constantly accuse plaintiff of "altering" documents, "misrepresentation" of controlling relevant facts, presenting arguments "known to be inaccurate," submitting a "false oath" to the Patent Office, and "disguising" the truth. (Defs' Br. pp. 12, 47, 54, 55, 57.) At the same time defendants concede that if they were required to prove fraudulent or wrongful intent in order to establish their defense, a genuine issue as to a material fact would exist. (Oral Argument Tr. p. 6; Defs' Reply Br. p. 2.)

■ Notwithstanding this thorough lacing of their papers with claims of fraud, defendants ambivalently contend that proof of material misstatements or non-disclosures before the Patent Office, standing alone and without establishment of an intent to deceive or of recklessness, would amount to unclean hands. We disagree. The law is to the contrary.

■ We start with the principle that an applicant for a patent owes "the highest degree of candor and good faith" to the Patent Office, Kingsland v. Dorsey, 338 U.S. 318, 319, 70 S.Ct. 123, 124, 94 L.Ed. 123 (1949), which has been described in an oft-cited Supreme Court decision as an "uncompromising duty to report to it [Patent Office] all facts concerning possible fraud or inequitableness underlying the applications in issue." Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945). See, in accord, Chas. Pfizer & Co. v. FTC, 401 F.2d 574, 579 (6th Cir. 1968); Corning Glass Works v. Anchor Hocking Glass Corp., 253 F.Supp. 461, 470 (D.Del.1966); A. H. Emery Company v. Marcan Products

Corp., 389 F.2d 11 (2d Cir.), cert. denied, 393 U.S. 835, 89 S.Ct. 109, 21 L. Ed.2d 106 (1968). Although it is difficult to formulate a standard that will encompass all types of misconduct that would amount to inequity on the part of an applicant, the basic underlying theme is that there must be some element of wrongfulness, willfulness or bad faith that transgresses the basic concept of doing equity. It must be remembered that the purpose of the unclean hands doctrine in patent cases is to discourage an applicant from taking advantage of the fact that the prosecution of a patent application is essentially an *ex parte* rather than an adversary proceeding and that the Patent Examiner accordingly must rely heavily upon the information furnished to him by the applicant. However, to deny enforcement as a matter of law merely because of an innocent or good faith non-disclosure would go beyond what is necessary to protect the public against the improvident granting of a monopoly. Such a standard could also have the harmful effect of forcing a patent solicitor to flood the Patent Office in each case with a mass of data of doubtful materiality rather than take the risk that an inventor might later be denied the fruits of his monopoly because of failure to reveal some fact later magnified out of proportion by an infringer seeking to escape the reach of the patent by combing the inventor's files under our liberal pretrial discovery procedures and dredging up new found "facts." In this respect the situation would become analogous to that already presented by the deluge of class actions instituted under the federal securities laws by investors claiming "fraud" on the basis of second guessing with the aid of microscopic examination of the issuer's files.

■ We believe that the stringent standard urged by defendants is unnecessary to protect the public, and that an applicant for a patent should be accorded the right to exercise good faith judgment in deciding what matters are and are not of sufficient relevance and mate-

riality to require disclosure. Only when he is guilty of fraud, willfulness or recklessness indicating a disregard for his duty of frankness should enforcement of the patent be barred. See Armour & Co. v. Wilson & Co., 274 F.2d 143 (7th Cir. 1960); Ritter v. Rohm & Haas Company, 271 F.Supp. 313 (S.D.N.Y. 1967). Furthermore, the authorities cited by defendants simply do not support their contention that mere negligent omissions or misstatements before the Patent Office would be unclean hands. On the contrary, they reveal that fraud or reckless disregard for the facts must be established. In the leading case cited by defendants on the subject, Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993 (1945), the district court and the Supreme Court found that "The history of the patents and contracts in issue is steeped in perjury and undisclosed knowledge of perjury." There a Mr. Larson's application was admittedly based on false data.

> "Yet Automotive, with at least moral and actual certainty if not absolute proof of the facts concerning the [Larson] perjury, chose to act in disregard of the public interest. Instead of doing all within its power to reveal and expose the fraud, it procured an outside settlement of the interference proceedings, acquired the Larson application itself, turned it into a patent and barred the other parties from ever questioning its validity. Such conduct does not conform to minimum ethical standards and does not justify Automotive's present attempt to assert and enforce these perjury-tainted patents and contracts." *Id.* at 816, 65 S.Ct. at 998.

It was crucial that Automotive not only believed the application to be fraudulent but acted in disregard of that belief. *Id.* at 817. In the present case defendants have not claimed to show, nor could they prove as a matter of law on this motion, willful failure to disclose evidence of perjury or fraud.

*Precision's* progeny also fail to lend support to defendants' position. In Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 407 F.2d 288, 295 (9th Cir. 1969), cited by defendants, the court held that there was a deliberate withholding of information regarding statutory bars, which if known to the Examiner, would have led him to refuse the patent. In Monsanto Co. v. Rohm & Haas Co., 312 F.Supp. 778 (E.D.Pa.1970), the court ruled that certain statements made to the Patent Office were knowingly false and concealed material facts which would have led to the denial of the patent if known to the Examiner. Monsanto Co. v. Dawson Chemical Co., 312 F.Supp. 452, 463–465 (S.D.Tex.1970), emphasizes the impossibility of deciding this case in a motion for partial summary judgment. Given the same basic objective factual situation before the court in Monsanto Co. v. Rohm & Haas Co., *supra,* the *Dawson* court came to a *contrary* conclusion:

> "The crux of defendants' argument is that plaintiff breached its duty to the Patent Office and to the public by failing to disclose in the affidavit all of the information gained through the tests conducted by Dr. Husted. In effect, they are charging that plaintiff perpetrated fraud upon the Patent Office. If this is true, then, of course, the patent is unenforceable. [Citation omitted] Compare Precision Instr. Mfg. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) wherein it was held that the equitable doctrine of unclean hands barred plaintiff from enforcing a patent against an infringer when the patent was issued upon the basis of perjured testimony and suppression of facts which plaintiff had reason to know about. To establish this defense, it is necessary that defendants prove several elements, including the making of false or misleading statements and an intent to deceive the patent examiner. * * * The remaining contention on unclean

hands relates not to what was said, but rather to what was not said. Defendants have not established that the withholding of this information was done with an intent to deceive the Patent Office.

\* \* \* \* \* \*

"Before this opinion is concluded, it should be added that the possible effect of the decision in Monsanto Co. v. Rohm & Haas Co., 312 F.Supp. 778 (E.D.Pa.1970) upon the result here reached has been carefully considered. Even though there is an identity of subject matter between that case and this one, the fact nevertheless remains that there is no identity between the parties defendant \* \* \*." (*Id.* at 462–463, 464–465).

In Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F.2d 555 (5th Cir. 1970), also relied upon by defendants, the court found that the applicant deliberately withheld knowledge of prior art which would have resulted in refusal of the patent. *Id.* at pp. 560, 564, 565. In A. H. Emery Company v. Marcan Products Corp., 389 F.2d 11 (2d Cir. 1968), cert. denied, 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968), the trial court found that the signing of an oath in support of an application without reading it, which stated that there had been a sale of the patented subject matter more than one year prior to the application, was negligent but not fraudulent, and refused to apply the doctrine of unclean hands, accepting the district court's conclusion that the infringers "should not be permitted to get off scot-free merely because plaintiff's conduct in some respects may leave something to be desired." (*Id.* at 17).

Defendants' reply brief shifts their emphasis to the most recent case applying the unclean hands doctrine, SCM Corp. v. Radio Corporation of America, 318 F.Supp. 433 (S.D.N.Y.1970). There, however, Judge McLean found *intentional* non-disclosure of relevant facts. Though plaintiff in that case could not prove that the RCA patent would not have issued *but for* the intention-

al non-disclosure, the court held that the unclean hands doctrine should bar enforcement of the RCA patent since the non-disclosed facts were material and could have misled the Examiner:

"On the basis of the evidence I find that it was inaccurate to report $10^{-9}$ without change or qualification as the correct standard. [footnote omitted]

"Did RCA, that is to say, the RCA scientists and lawyers who had a hand in this affair and whose knowledge binds RCA, know that it was inaccurate? I cannot escape the conclusion that they did.

\* \* \* \* \* \*

"I find that RCA knew that the unqualified assertion of $10^{-9}$ as the correct standard was inaccurate. I find that RCA continued to assert that standard to the Patent Office because RCA feared that otherwise its chance of obtaining a patent would be impaired.

\* \* \* \* \* \*

"It may be unduly harsh to characterize RCA's conduct here as fraud. Conduct which has been so labeled in the decisions has, by and large, been more reprehensible than this. But at the least, it was conduct which was lacking in candor. It was intentional nondisclosure of relevant data which might have affected the outcome of the patent application." (318 F.Supp. at 447–448).

See also Mercantile National Bank v. Quest, Inc., 303 F.Supp. 926, 933 (N.D. Ind.1969), affd., 431 F.2d 261 (7th Cir. 1970); Corning Glass Works v. Anchor Hocking Glass Corp., 253 F.Supp. 461, 470–471 (D.Del.1966), rev'd on other grounds, 374 F.2d 473 (3d Cir. 1967), cert. denied, 389 U.S. 426, 88 S.Ct. 65, 19 L.Ed.2d 80; Holmes v. Thew Shovel Co., 162 U.S.P.Q. 559, 564 (N.D.Ohio 1969) (no federal report).

■ Since defendants admit that they cannot show plaintiff's state of mind as a matter of law, partial summary judgment must be denied.

But even if we accepted the theory that mere negligent non-disclosure would be sufficient, genuine issues as to material facts are presented with respect to most, if not all, of the various specific acts claimed to have constituted improper conduct and lack of candor. The first of these is plaintiff's conduct in masking out the legend "ZnS" from a notebook page (p. 13 of Battelle Notebook 5003, dated Jan. 10, 1950) submitted to the Patent Office in support of the application. The page represented a test on a binder plate containing RCA Phosphor F 2032, which plaintiff represented to be a zinc oxide phosphor binder plate. Plaintiff contends that the legend "ZnS" was masked out because it was an erroneous reference since F 2032 was not zinc sulfide but was believed by all persons concerned to be zinc oxide, the zinc sulfide being RCA Phosphor F 2046.[4]

Defendants agree that the compound used was not in fact pure zinc sulfide because it contained 20% cadmium sulfide (CdS), but they argue that the "ZnS" notation was "obviously" a more accurate characterization than zinc oxide and that the presence of the "ZnS" label gave rise to a strong suggestion to question the chemical composition of the binder plate. Defendants state that the "ZnS" legend was "not irrelevant" and that in altering the document to remove the "ZnS" marking, which suggested that the chemical composition of the plate was other than what plaintiff represented it to be, plaintiff obscured from the view of the Patent Office the contrary suggestion.

On the basis of the evidence thus before us we cannot conclude that the "ZnS" entry was relevant as a matter of law. It may be found at trial that if the Patent Office had decided to inquire into the matter it would have received the same answer as did Mr. Simmons and concluded that the entry was erroneous and therefore irrelevant.

Defendants next point to plaintiff's statement to the Patent Office that the broad claims (which would cover zinc oxide) had been inserted in the M–2 application prior to any knowledge by plaintiff that RCA was asserting that it had independently invented the zinc oxide binder plate. Defendants claim that this was a false representation of a material and relevant fact. Plaintiff flatly denies the charge, pointing to the testimony of Simmons, the person who amended the M–2 application, that he had added the broad claims on the basis of the zinc oxide work done at Battelle, long prior to RCA's disclosures in 1952 and 1953 to plaintiff. Plaintiff further contends that defendants' interpretation of earlier Battelle reports is erroneous because the reports referred to the high-speed panchromatic, continuous-tone subject matter of the Signal Corps contract, which involved special requirements not relevant to the suitability of the materials for general purpose electrophotography. It is difficult to conceive of a more genuine issue of material fact.

Another claim of defendants is that plaintiff incorporated into its M–3 application the invention that had been disclosed to it by RCA, including the use of zinc oxide. Plaintiff replies that zinc oxide binder plates and the use of paper as a backing had been developed at Battelle prior to the RCA work and had been disclosed by Battelle to RCA, so

---

4. Plaintiff explains its action as follows: in an affidavit executed by Middleton and Reynolds and submitted in response to the first Office Action with respect to the M–3 application the work with the RCA phosphor F 2032 was relied upon to establish a date of invention prior to the filing date of the Greig abandoned application, September 29, 1951. In 1967, RCA for the first time asserted that the RCA phosphor F 2032 was not a zinc oxide material but instead a mixed zinc oxide material. However, there is testimony that an early RCA catalog identified RCA F 2032 as a zinc oxide material and, until 1967, nobody had questioned the identity of RCA F 2032 as zinc oxide. See Mase Deposition 44–45; Simmons Deposition 264–65. This catalog has not been found, though defendants have marked for identification a 1948 RCA brochure which identifies phosphor F 2032 as a zinc sulfide-cadmium sulfide, silver-activated phosphor.

that the specific formulation of a certain background grade of zinc oxide was in fact derived from the work at Battelle to which plaintiff was entitled. The obvious issue of fact renders it unnecessary to comment.

Defendants also claim that a statement made in the prosecution of the M–3 application to the effect that Example 3 of the M–2 application did not refer to a phosphor material was untrue. Plaintiff denies any misrepresentation, pointing to Simmons' testimony to the effect that the statement referred only to the intrinsic characteristics of cadmium-zinc sulfide crystal compositions and to the fact that the description of the material in Example 3 did not indicate that the material used was a phosphor. We need go no further to illustrate that, quite aside from the issue of plaintiff's intent, genuine technical issues are presented which it would be foolhardy for us to attempt to resolve without the benefit of expert testimony and cross-examination.

The second ground urged in support of defendant's motion, their contention that plaintiff misrepresented to the Patent Office the work done on the zinc titanate binder plate disclosed in the M–1 application and the inventorship of that plate when they stated that it was jointly invented by Middleton and Reynolds, deserves little mention. As we stated upon oral argument, the contention raises at best a highly technical defense. In the first place zinc titanate was never specifically claimed as such and would therefore constitute the invention of Middleton and Reynolds only to the extent that it fell within the scope of their generic compound. It was not necessary for them to prepare and test a zinc titanate binder plate for it to fall within their joint invention. Furthermore, Middleton's deposition testimony raises an issue as to whether he had completely conceived of a zinc titanate binder plate before he became associated with Reynolds.

For the foregoing reasons defendants' motion is denied.

It is so ordered.